22CA1264 Peo v Flynn 12-05-2024

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA1264
Mesa County District Court No. 22CR530
Honorable Richard T. Gurley, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Paul W. Flynn,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE BROWN
Welling and Moultrie, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced December 5, 2024

Philip J. Weiser, Attorney General, William G. Kozeliski, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Shann Jeffery, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1　　Defendant, Paul W. Flynn, appeals the judgment of conviction entered upon a jury verdict finding him guilty of child abuse resulting in serious bodily injury.  Flynn contends that (1) the district court's characterization of the defense-offered Crim. P. 24 statement improperly lowered the prosecutor's burden of proof; (2) the district court abused its discretion by refusing to dismiss a juror for alleged misconduct; and (3) the evidence presented at trial was insufficient to sustain his conviction.  We reject these contentions and affirm.

## I.　Background

¶ 2　　The following evidence was presented at trial.  Flynn is the father of K.F., who was born in May 2019.  K.F. was healthy when she was born, and Flynn and K.F.'s mother both took parenting classes before her birth.

¶ 3　　In the first ten months of K.F.'s life, she experienced three incidents during which she stopped breathing.  The first incident occurred when she was six weeks old.  Flynn had K.F. with him in a men's bathroom at a Walmart when he frantically emerged to inform K.F.'s mother that K.F. had stopped breathing and turned pale and blue.  K.F. began breathing again after her mother rubbed

her chest.  According to Flynn, K.F. stopped breathing while he was preparing a bottle for her.

¶ 4    The second incident occurred when K.F. was five months old. Flynn was home with K.F. in an upstairs bedroom while K.F.'s mother was preparing dinner in the kitchen.  Flynn screamed for help, and K.F.'s mother ran upstairs to find K.F. lying on the floor. K.F.'s mother immediately took K.F. outside to the front porch, hoping that the cold outside would stimulate her breathing.  After approximately thirty seconds in the cold, K.F. began breathing again.  When asked later, Flynn could not explain what had led to K.F.'s loss of breath.

¶ 5    The third incident occurred on March 29, 2020, when K.F. was ten months old, and gave rise to the conviction in this case. Other household members were in the living room of Flynn's home when they witnessed Flynn run downstairs and outside, carrying K.F. and yelling for someone to call 911 because K.F. was not breathing.  A "couple minutes later," K.F. was breathing again. K.F.'s mother was not home at the time.  Although K.F.'s mother had not noticed any unusual bruises or marks on K.F. when changing her earlier that day, doctors later discovered that K.F. had

suffered multiple injuries, including bruises and two broken ribs, which were at different stages of healing.

¶ 6     On March 30, an investigator from the Mesa County Sheriff's Department interviewed Flynn. After Flynn stated "I know it's my fault[,]" the investigator sought clarification, asking, "I just wanna make sure we're givin' you a fair shake here. You're convinced you're the one that did it?" Flynn replied, "Cause everyone is sayin' that I'm holdin' her too tight, and . . . it's always happened in my possession. It . . . has to be me." Flynn further conceded, "I get too upset and too frustrated and don't realize what I'm doing to the point where I hurt her."

¶ 7     Flynn was charged with five counts of child abuse resulting in serious bodily injury, one count of child abuse (second or subsequent offense), and a habitual child abuser sentence enhancer. Following a five-day trial, the jury found Flynn guilty of one count of child abuse resulting in serious bodily injury.[1] The

_____

[1] The district court granted Flynn's motion for judgment of acquittal on two counts of child abuse resulting in serious bodily injury. The prosecution moved to dismiss the child abuse (second or subsequent offense) charge and the habitual child abuser sentence enhancer. And the jury acquitted Flynn of two counts of child abuse resulting in serious bodily injury.

court sentenced Flynn to fifteen years in the custody of the Department of Corrections.

## II. The Crim. P. 24 Statement

¶ 8    Flynn contends that the district court erred by recharacterizing a Crim. P. 24 statement as a preview of the trial evidence, which impermissibly lowered the prosecution's burden of proof.  We conclude that the court's comments did not lower the burden of proof.

## A. Additional Background

¶ 9    Before trial, defense counsel submitted a Crim. P. 24 statement to provide relevant context for the prospective jurors to respond to questions asked of them during jury selection.  *See* Crim. P. 24(a)(2)(iv).  After the district court forgot about the statement, defense counsel reminded the court to read it to the venire.  The court introduced the statement as "a little summary of what the allegations are on the case," but warned the prospective jurors that they were "to make [their] decision based upon the evidence that's presented or lack of evidence that's presented, whatever the case might be."

¶ 10     The court then read the statement defense counsel had drafted:

> On March 29, 2020, 9-month-old [K.F.] stopped breathing while her father, Paul Flynn, was watching her and she was brought to the hospital.  At the emergency room, doctors determined that she had two broken ribs in different stages of healing; the injuries were consistent with "non-accidental trauma." The doctors deemed the breathing incident to be a Brief Resolved Unexplained Event (BRUE), and police subsequently learned that [K.F.] had stopped breathing on two prior occasions while under Mr. Flynn's care, including once when she turned blue.  While at the emergency room on March 29, a doctor confronted Mr. Flynn about their concerns of abuse and Mr. Flynn became so angry that others had to intervene.  [K.F.] was then placed in DHS custody and since then, she has not had any more BRUEs.  Mr. Flynn interviewed with police and admitted that he has squeezed [K.F.] too tightly on several occasions.  He also admitted that [K.F] had once fallen into some plastic shelves at their home and bruised her face.

The court finished by saying, "So, that's a little synopsis of how — or what I think eventually led to these charges."

¶ 11     The court then asked the venire whether there was "[a]nything about that synopsis that ma[de] anybody think they couldn't fairly assess the evidence in this case?"  After a prospective juror

volunteered that they "would be biased just hearing that already," the court responded, "I had a little hesitancy reading that because the evidence is going to be what it is here.  And so you think that you'd have trouble waiting to hear what [the] People have to say about this in detail?"  The juror highlighted the substance of the statement — specifically, the "findings" of "the police and the ER doctor" — and said it "seems hard to kind of see it any other way." Several other prospective jurors raised similar concerns.

## B. Standard of Review and Applicable Law

¶ 12    The Due Process Clause of the United States Constitution "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *Tibbles v. People*, 2022 CO 1, ¶ 23 (quoting *In re Winship*, 397 U.S. 358, 364 (1970)).  "Intrinsically related to this standard is the presumption of innocence afforded criminal defendants."  *Id.* at ¶ 24; *see Winship*, 397 U.S. at 363 ("The [reasonable doubt] standard provides concrete substance for the presumption of innocence.").  Accordingly, trial courts "must properly instruct the jury on . . . the reasonable doubt standard." *Tibbles*, ¶ 25.  Instructions that lower the prosecution's burden of

6

proof constitute structural error and require automatic reversal. *Id.* at ¶ 22.

¶ 13 We review de novo whether the trial court's instructions improperly lowered the prosecution's burden of proof. *Id.*; *Johnson v. People*, 2019 CO 17, ¶ 8. To determine whether a court's statements to a jury lowered the burden of proof, we "must ask whether there is a reasonable likelihood that the jury understood the court's statements, in the context of the instructions as a whole and the trial record, to allow a conviction based on a standard lower than beyond a reasonable doubt." *Tibbles*, ¶ 43. We look at "the nature of the statements, the context in which they were made, any other explanations or instructions that the court may have provided, and, of course, the court's final jury charge." *Id.* at ¶ 41. Importantly, we apply the same standard to the court's informal comments as we do formal instructions because "we do not expect jurors to make fine distinctions between statements of applicable law that the court makes in one context as opposed to another." *Id.* at ¶ 40.

¶ 14 The district court made the comments at issue during voir dire. The purpose of voir dire is "to inform prospective jurors about

their duties . . . and to obtain information about prospective jurors to facilitate an intelligent exercise of challenges for cause and peremptory challenges."  Crim. P. 24(a).  During voir dire, a trial court must explain to prospective jurors the "[g]eneral legal principles applicable to the case including the presumption of innocence, burden of proof, definition of reasonable doubt, elements of charged offenses and other matters that jurors will be required to consider and apply in deciding the issues."  Crim. P. 24(a)(2)(v); *see People v. Clemens*, 2017 CO 89, ¶ 17.  As is relevant here, a trial court should explain the "nature of the case using applicable instructions if available, or alternatively a joint statement of factual information intended to provide a relevant context for the prospective jurors to respond to questions asked of them."  Crim. P. 24(a)(2)(iv).

## C. The District Court's Statements Did Not Lower the Prosecution's Burden of Proof

¶ 15    As an initial matter, to the extent Flynn contends that he was prejudiced by the *content* of the statement, we conclude that he invited any error.  The invited error doctrine prevents a party from complaining on appeal of an error they have invited or injected into

8

the case. *People v. Rediger*, 2018 CO 32, ¶ 34. "Invited error most often arises in holding a defendant responsible for tendering or agreeing to a jury instruction later challenged on appeal." *People v. Foster*, 2013 COA 85, ¶ 26, *abrogated on other grounds by Wells-Yates v. People*, 2019 CO 90M, ¶ 66. If the claim of error "resulted from the affirmative injection of error into the case, then the claim of error is unreviewable." *People v. Garcia*, 2018 COA 180, ¶ 6.

¶ 16      Defense counsel drafted and tendered the Crim. P. 24 statement and reminded the district court that it needed to read the statement to the prospective jurors. And based on our review of the record, most of the prospective jurors' concerns stemmed from the facts contained in the statement, not the court's comments about it. For example, one prospective juror told the court that the content of the statement left him feeling as though he "wouldn't be fair for Mr. Flynn." Another explained that, given K.F.'s bruising and Flynn's admission to squeezing her too tight, he would "presume [Flynn was] guilty right from the get-go." To the extent Flynn complains of prejudice that flowed from the substance of the Crim. P. 24 statement, he invited any error, and we will not consider his claim.

¶ 17    Setting the substance of the statement aside, Flynn argues that "the court's re-characterization of the Crim. P. 24 statement as a preview of the trial evidence lessened the prosecutor's burden of proof at trial and evaporated the presumption of innocence."  Flynn focuses on three comments made by the court during voir dire, so we do the same.

### 1.    What "Led to these Charges"

¶ 18    First, immediately after reading the Crim. P. 24 statement aloud to the venire, the district court framed it as "a little synopsis of how — or what I think eventually led to these charges."  Flynn contends that the court's comment improperly instructed the venire that "the defendant's actions, as described in the Crim. P. 24 instruction, were what led to the charges in the case."

¶ 19    Flynn cites *People v. Estes*, which held that courts should avoid suggesting that a defendant "did something" to be charged with a crime.  2012 COA 41, ¶ 10.  But the *Estes* division also explained that the risk that such comments "lessened the prosecution's burden of proof or refuted the presumption of innocence" may be "mitigated by the court's written jury instructions and other statements correctly explaining the

10

applicable burdens and presumptions." *Id.* at ¶ 12.  Because the
district court repeatedly and correctly explained the appropriate
burdens and presumptions to the jurors, we conclude there is no
reasonable likelihood that the jury understood the comment as
lowering the burden of proof.  *See id.*; *Tibbles*, ¶ 43.

¶ 20     During voir dire, the court

- explained that allegations brought by the prosecution "are
  not proof of anything because certainly they can file a
  complaint against anybody, but they have to prove the
  allegations . . . by proof beyond a reasonable doubt";

- explained that "any person who's accused by a prosecutor
  in the United States enjoys what is called the presumption
  of innocence";

- correctly instructed the venire on the definition of
  reasonable doubt and explained that the prosecution's
  burden of proof "goes to every element of an offense, not
  just some of them";

- encouraged the jury to avoid thinking of the "allegations" as
  things "this person did" but rather as "what this person's

accused of" or "what this person's presumed to be innocent of"; and

- reminded the venire that the charges against Flynn "are not proof of anything" and it should "not . . . infer anything" from the charges, reiterating that "the prosecution bears the burden of proving these [charges] by proof beyond a reasonable doubt."

¶ 21 The court also gave a complete set of standard instructions to the jury at the close of evidence, which included the following:

- "The charges against Mr. Flynn are just accusations" and "[t]he fact that Mr. Flynn has been accused is not evidence that Mr. Flynn committed any crime."

- "Every person charged with a crime is presumed innocent" and the "presumption of innocence remains with Mr. Flynn throughout the trial and should be given effect by you unless, after considering all the evidence, you are then convinced that Mr. Flynn is guilty beyond a reasonable doubt."

- "The burden of proof is upon the prosecution to prove to the satisfaction of the jury beyond a reasonable doubt the

existence of all of the elements necessary to constitute the crimes charged."

- The legally correct definition of "reasonable doubt."

- The theory of Flynn's defense that "his statements in his interview and the text messages to [Mother] show him feeling responsible for his injured child, not confessing to child abuse."

¶ 22    On this record, even if we presume that the court's single inartful comment to the prospective jurors suggested Flynn "did something" to bring about the charges, its repeated instructions accurately explaining the burdens and presumptions eliminated any risk that the jury believed it could convict based on a standard lower than beyond a reasonable doubt.  *See Estes*, ¶ 12; *Tibbles*, ¶ 43.

    2.    "[T]he Evidence Is Going To Be What It Is Here"

¶ 23    Second, when responding to a juror who expressed concerns about the content of Flynn's Crim. P. 24 statement, the district court noted that it "had a little hesitancy reading [the statement] because *the evidence is going to be what it is here*."  (Emphasis added.)  Flynn argues that the court recharacterized the statement

as a preview of the trial evidence and consequently "lessened the prosecutor's burden of proof . . . and evaporated the presumption of innocence" as a result.

¶ 24    We do not read the court's comment as Flynn does.  The court did not improperly suggest to the prospective jurors that the content of the Crim. P. 24 statement was the evidence on which they should base their verdict.  Rather, the court's comment that "the evidence is going to be what it is here" is more reasonably understood as distinguishing the Crim. P. 24 statement from the evidence that would be presented "here" — that is, in the courtroom during trial.  For example, immediately after making the comment, the court asked a prospective juror if they would "have trouble waiting to hear what [the] People have to say about this in detail?"  And when another juror voiced concern, the court asked, "You couldn't wait to hear the evidence first?"  The court repeatedly reminded the venire that it "[had not] heard any evidence yet" and, unless the prosecution proved the charges beyond a reasonable doubt, the verdict must be not guilty.

¶ 25    Even so, we conclude that there is no reasonable likelihood that the jury understood the comment to lower the prosecution's

14

burden of proof. *See Tibbels*, ¶ 43. Before introducing the Crim. P. 24 statement, the court correctly explained that the statement was "a little summary of what the allegations are on the case" and that the jury is "to make [its] decisions based on the evidence that's presented or lack of evidence that's presented whatever the case might be." And as noted, the court correctly instructed the jury on the applicable burdens and presumptions repeatedly during voir dire and in its closing instructions.

### 3. Bench Conference with a Prospective Juror

¶ 26 Third, during a bench conference with an individual member of the venire who expressed concerns about Flynn's admissions in the Crim. P. 24 statement, the district court asked, "I mean, he said (indiscernible) squeezed the baby and (indiscernible). He didn't say he broke the baby's bones, but he squeezed . . . does that make a difference?" Flynn argues that the court's comments "invited the venire members to pre-deliberate with the court on this previewed evidence." But because the comment was made to a single prospective juror who was subsequently dismissed and was not heard by the remaining venire members, we conclude there is no

possibility that the jury understood the comment to invite pre-deliberation or to lower the burden of proof.

### III. Potential Jury Misconduct

¶ 27    Flynn contends that the district court abused its discretion by refusing to dismiss a juror who was involved in a verbal altercation with another juror. We are not persuaded.

### A. Additional Background

¶ 28    On the final day of trial, the district court received a note from Juror Be. detailing an argument that she had with Juror Bu. According to the note, Juror Bu. "verbally attacked" Juror Be. after she made a comment about the price of gas. According to the note, Juror Be. attempted to continue the conversation but Juror Bu. "became more verbally abusive" and told Juror Be. to "shut up." The note continued, "At that point, I quit talking and had to get up and walk around to settle my inner stress/upset. So I was unable to give my complete attention while the witnesses were testifying." As the parties requested, the court interviewed the two jurors to determine what had happened.

¶ 29    During her interview, Juror Be. expressed concerns about sharing her opinion in jury deliberations given her interaction with

16

Juror Bu. Following the interview, the court noted that it was concerned by Juror Be.'s statement that "[she] was unable to give [her] complete attention while the witnesses were testifying." The court explained, "It's clear that she was startled by this other juror's interaction with her." "[O]ut of an abundance of caution," the court excused Juror Be.

¶ 30 During his interview, Juror Bu. shared that the conflict had no impact on his ability to listen to the evidence. When asked whether the conversation left him with any concerns about the eventual deliberations in the case, Juror Bu. responded that "[t]he conversation had nothing to do with the case," adding that "[Juror Be.] would not let it go. . . . I put it aside. Apparently she did not put it aside."

¶ 31 Following the interview, defense counsel asked that Juror Bu. be removed from the jury because "someone who has a history or just very recently engaged in behavior that intimidated another juror really concerns me in terms of the jury as a whole being able to reach a verdict[.]" Defense counsel continued, "[B]ut also with each juror . . . not being overborne or coerced into a position that

17

they don't necessarily agree with because of someone's strong or forceful attitude or intimidating factors."

¶ 32    The district court denied Flynn's request:

> I'm not going to excuse [Juror Bu.] I mean . . . he says that he can deliberate. I think it's a concern that everybody has in jury selection is that . . . there's going to be a difference of personalities in the jury rooms. . . . [S]ome jurors might be more overbearing than others. You've all seen, I'm sure as lawyers, the movie "12 Angry Men," and there are certainly very overbearing personalities in that movie [and] that jury worked through it. . . . I guess if I was concerned that there would be some type of harm coming to the jurors because of some disagreement, that might be different. I don't see that as the case here. He viewed the interaction differently than [Juror Be.] She obviously was impacted by it, and it affected her ability to listen carefully to the testimony of the witnesses this morning, which is why I excused her. But I don't see any reason on the record here to strike [Juror Bu.] and then replace him with an alternate.

### B.    Standard of Review and Applicable Law

¶ 33    We review a trial court's decision to excuse a juror for misconduct for an abuse of discretion. *People v. King*, 121 P.3d 234, 241 (Colo. App. 2005). A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or when it misapplies the law. *People v. Sims*, 2019 COA 66, ¶ 44.

18

¶ 34    Jury misconduct that materially affects the substantial rights of a party and prevents a fair and impartial trial may serve as grounds for a new trial. *People v. Evans*, 710 P.2d 1167, 1168 (Colo. App. 1985). Such claims require the defendant to "establish that he was prejudiced by the misconduct in order to overturn his conviction, and the prejudicial impact of the misconduct is a question of fact to be determined in light of all the circumstances of the trial." *Id.*

## C.    The District Court Did Not Abuse its Discretion by Retaining Juror Bu.

¶ 35    When Juror Be. notified the district court of an alleged instance of juror misconduct, the court paused the proceedings and conducted individual interviews with the two jurors involved. Because Juror Be. indicated that the conflict had impaired her ability to consider the evidence, the court excused her. Conversely, because Juror Bu. indicated that the conflict had not affected his ability to consider the evidence, the court did not excuse him.

¶ 36    Flynn argues that the court erred by focusing its decision to retain Juror Bu. on his ability to consider the evidence. Specifically, he contends that the court (1) failed to consider

19

whether Juror Bu.'s alleged aggression was gender-based; (2) failed to interview the remaining jurors to determine whether they witnessed the argument or were impacted by it; and (3) applied an erroneous "12 Angry Men" standard. We reject these contentions.

¶ 37     First, the record is devoid of any evidence that the conflict between Jurors Be. and Bu. was influenced by gender. True, Juror Bu. was male and Juror Be. was female. But Juror Be. did not suggest to the court that Juror Bu. argued with her because of gender. When asking for Juror Bu. to be removed from the jury, defense counsel did not raise gender bias. And Flynn fails to point to any record support for this claim. Flynn's argument that gender influenced the conflict between Jurors Be. and Bu. is speculative and does not support a claim that the court abused its discretion by not considering whether Juror Bu.'s alleged aggression was gender-based.

¶ 38     Second, the record also fails to reveal that any other juror observed the conflict between Jurors Be. and Bu., let alone was affected by it. Defense counsel contemporaneously expressed a concern with the potential for Juror Bu.'s "strong and forceful attitude" to impact the jury's ability to reach a verdict, but that

concern focused on the personality dynamics that might arise during deliberations rather than on whether any other juror had witnessed or been influenced by the argument between Jurors Be. and Bu. Defense counsel did not suggest that another juror had seen the argument and did not ask the court to question the other jurors about the incident. In the absence of these prompts, we cannot conclude that the court abused its discretion by not interviewing the remaining jurors to determine whether they saw the argument or were impacted by it.

¶ 39 Finally, the court did not apply a "12 Angry Men" standard to its decision as Flynn suggests. Rather, the court merely pointed to the film to illustrate that personality conflicts sometimes occur during jury deliberations. In fact, the court's reference suggests that it considered the potential impact of Juror Bu.'s demeanor on other jurors, despite Flynn's argument otherwise. Because the district court was better positioned to observe how the juror's demeanor and conduct may have impacted deliberations, we defer to its conclusion that Juror Bu. was able to serve without having an outsized influence on his fellow jurors. *Cf. People v. Blassingame,* 2021 COA 11, ¶ 23 (because trial courts can observe the dynamics

of voir dire and personally evaluate the juror's tone and demeanor, we defer to its judgment as to whether it believes a particular juror can render a fair and impartial verdict).

¶ 40 In the end, we perceive no prejudice flowing from the district court's decision to retain Juror Bu. The record demonstrates that the conflict was limited to the two jurors whom the court questioned, the disputed topic had nothing to do with Flynn's case, and Juror Bu. did not make any threats or engage in abusive conduct. The record does not reflect that Juror Bu. had a conflict with any other juror or improperly influenced jury deliberations.

## IV. Sufficiency of the Evidence

¶ 41 Flynn contends that the evidence presented at trial was insufficient to prove beyond a reasonable doubt that his conduct caused K.F. to stop breathing on March 29, 2020. We disagree.

### A. Standard of Review and Applicable Law

¶ 42 When a defendant raises a challenge to the sufficiency of the evidence, "[w]e review the record de novo to determine whether the evidence before the jury was sufficient both in quantity and quality to sustain the defendant's conviction." *Johnson v. People*, 2023 CO 7, ¶ 13 (citation omitted). "It does not matter whether we might

have reached a different conclusion were we the trier of fact." *People v. Liebler*, 2022 COA 21, ¶ 14. Rather, "[t]he pertinent question is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Clark v. People*, 232 P.3d 1287, 1291 (Colo. 2010)). The verdict must be supported by more than "guessing, speculation, conjecture, or a mere modicum of relevant evidence." *People v. Perez*, 2016 CO 12, ¶ 25. But in determining the sufficiency of evidence, the law makes no distinction between direct and circumstantial evidence. *People v. Buckner*, 2022 COA 14, ¶ 83.

¶ 43    Flynn was convicted of one count of child abuse resulting in serious bodily injury. Under section 18-6-401(1)(a), C.R.S. 2024,

> A person commits child abuse if such person causes an injury to a child's life or health, or permits a child to be unreasonably placed in a situation that poses a threat of injury to the child's life or health, or engages in a continued pattern of conduct that results in malnourishment, lack of proper medical care, cruel punishment, mistreatment, or an accumulation of injuries that ultimately results in the death of a child or serious bodily injury to a child.

23

B. The Evidence Was Sufficient to Support Flynn's Conviction

¶ 44 Flynn does not dispute that K.F. suffered serious bodily injury when she stopped breathing on March 29, 2020. Instead, he contends that the prosecution failed to prove beyond a reasonable doubt that his conduct caused K.F. to stop breathing. Citing to the testimony of the prosecution's expert witness, Dr. Jenna Rosenthal, Flynn argues that "even the most expert witness was unable to determine what caused K.F. to temporarily lose her breath" that day.

¶ 45 Although no single witness testified that K.F. stopped breathing on March 29 because Flynn squeezed her too tightly, the prosecution presented the following evidence at trial:

- Dr. Rosenthal determined after reviewing K.F.'s medical records — including records from her family physician, the radiologist, and the attending physician — that the bruising and fractures K.F. suffered were "the result of child abuse."

- Flynn was alone with K.F. when she stopped breathing on March 29 and had been alone with her when she stopped breathing on two prior occasions.

- K.F.'s mother testified that she did not notice any unusual bruises or marks on K.F. when changing her earlier in the day on March 29.

- Flynn made incriminating statements to the investigator including, "I get too upset and too frustrated and don't realize what I'm doing to the point where I hurt her"; "I know it's my fault. I know it is"; and "[I]t's always happened in my possession. It . . . has to be me."

- K.F.'s mother testified that Flynn held K.F. "too tightly" on multiple occasions, often when he was "too frustrated or he was too upset."

- Other household members testified that they witnessed Flynn holding K.F. too tightly. One even described Flynn's treatment of K.F. as "cruel." Another testified that Flynn was dismissive of his concerns after she told Flynn he was holding K.F. "a little bit too tight."

- K.F.'s family physician testified that, while he initially classified K.F.'s first two stop-breathing events as "BRUE," after learning of the third event on March 29, he wrote a

letter to "Child Protective Services expressing his concerns regarding K.F.'s safety.

¶ 46     We recognize that the evidence presented was largely circumstantial.  But viewing this evidence collectively and in the light most favorable to the prosecution, we conclude that it was substantial and sufficient for a reasonable jury to find beyond a reasonable doubt that Flynn caused K.F.'s serious bodily injury on March 29, 2020.  *See People v. Christian*, 632 P.2d 1031, 1038 (Colo. 1981) (expert medical testimony that child's injuries were nonaccidental, combined with circumstantial evidence that injuries occurred during a time when defendant was alone with the child, was sufficient to support conviction for felony child abuse).

## V.     Disposition

¶ 47     We affirm the judgment of conviction.

JUDGE WELLING and JUDGE MOULTRIE concur.