The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader.  The summaries may not be cited or relied upon as they are not the official language of the division.  Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
May 9, 2019

## 2019COA66

**No. 15CA0634, *People v. Sims* — Courts and Court Procedure — Jurisdiction of Courts — Subject Matter Jurisdiction; Criminal Law — Indictments**

Defendant was convicted of murder, attempted murder, and sexual assault in connection with a home invasion that occurred eighteen years before trial.

Initially, the grand jury returned an indictment charging defendant under the then-current version of the sexual assault statute.  But because the language of the statute in effect at the time of the crime was different, the prosecution returned to the grand jury seven months before trial and obtained a superseding indictment containing a single count of sexual assault referencing the former version of the statute.

On appeal, defendant argues that the one-count "superseding indictment" supplanted the original indictment and divested the district court of jurisdiction over the original murder charges.

A division of the court of appeals rejects that argument, concluding that because each count of an indictment operates as its own indictment, the prosecutor may supersede any individual count. The mere fact that the prosecutor labeled the charging document a "superseding indictment" did not deprive the court of jurisdiction over the original charges, as the appellation of a document is not dispositive.

The division also rejects defendant's arguments that the sexual assault charge was barred by the statute of limitations and that the court erred in excluding evidence under the rape shield statute. Accordingly, the division affirms the defendant's convictions.

COLORADO COURT OF APPEALS                                    **2019COA66**

Court of Appeals No. 15CA0634
City and County of Denver District Court No. 12CR10292
Honorable William D. Robbins, Judge
Honorable Kenneth M. Laff, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Samuel Sims,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE HARRIS
J. Jones and Ashby, JJ., concur

Announced May 9, 2019

Philip J. Weiser, Attorney General, Kevin E. McReynolds, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Mark G. Walta, Alternate Defense Counsel, Denver, Colorado, for Defendant-
Appellant

¶ 1     Eighteen years after defendant Samuel Sims and three accomplices committed a brutal home invasion, the People charged Sims with murder, attempted murder, and sexual assault in connection with the incident.  A jury convicted him of all charges.

¶ 2     On appeal, Sims challenges his convictions on three grounds: (1) the "superseding" indictment, which contained only a single, amended sexual assault charge, divested the district court of subject matter jurisdiction over the charges contained in the original indictment; (2) the sexual assault charge was barred by the statute of limitations; and (3) the district court erred in excluding testimony, under the rape shield statute, that one of the victims was a prostitute who had traded sex for drugs.

¶ 3     We reject Sims's challenges and therefore affirm his convictions.

## I.    Background

¶ 4     On July 12, 1994, Sims, Jackie McConnell, and two other men broke into the home of Mack Martinez, a drug dealer known to McConnell, in search of drugs and money.  Once inside, the four intruders bound Martinez and his two house guests, tortured them, and slit their throats.  Only Martinez survived.  Before they

1

murdered Martinez's female friend, J.G., Sims and one of his accomplices raped her.

¶ 5     The police recovered DNA evidence from J.G.'s body, but testing did not lead to any suspects.  In 2009, police obtained a DNA sample from Sims.  They later conducted further forensic analysis of the DNA evidence and determined that Sims was the major source of the DNA recovered from J.G.'s vagina, and that he was a likely source of the DNA recovered from J.G.'s anus. (According to the prosecution's DNA expert, the chances that someone other than Sims was the source of the DNA from the anal swab were 1 in 7.9 billion.)

¶ 6     In 2012, a grand jury returned an indictment charging Sims with two counts of first degree murder after deliberation, two counts of first degree felony murder, one count of attempted murder, and one count of sexual assault.  The sexual assault count tracked the then-current statutory language, so, before trial, the prosecution obtained a second indictment charging Sims with one count of sexual assault under the 1994 version of the statute.

¶ 7     At trial, the prosecution presented testimony from Martinez, McConnell (who had entered into a plea agreement and was

cooperating with the prosecution), and four other witnesses (friends or acquaintances of Sims) who testified that, shortly after the home invasion, Sims had confessed his involvement in the crimes.

¶ 8    Though Sims had initially denied knowing J.G., at trial he suggested that his DNA was present in J.G.'s vagina because he had traded drugs for sex with J.G. at around the time of the murders.  To support that theory of defense, he sought to present testimony from a former roommate of J.G.'s that, a year before her murder, J.G. worked as a prostitute and occasionally traded sex for drugs with her suppliers, one of whom had the same nickname as Sims.  The court excluded the roommate's testimony under the rape shield statute.

¶ 9    As noted, a jury convicted Sims as charged.

## II.    The Superseding Indictment Did Not Divest the District Court of Jurisdiction Over the Original Indictment

¶ 10    The original indictment was filed in December 2012.  In addition to the murder and attempted murder counts, the indictment charged Sims with one count of sexual assault under the 2012 version of the sexual assault statute.  *See* § 18-3-402(1)(a), (5), C.R.S. 2012.  But the language of the 1994 version of

the statute, in effect when Sims was alleged to have committed the crime, was slightly different. *See* § 18-3-402(1)(a),(3), C.R.S. 1994.

¶ 11 After initially moving to amend the indictment, the prosecution elected to return to the grand jury for a second indictment charging sexual assault under the earlier version of the statute. A "superseding indictment," which contained only the new version of the sexual assault count, was filed in July 2014, seven months before trial.

¶ 12 Sims contends, as he did in the district court, that the "superseding" indictment supplanted and nullified the original indictment, thereby divesting the district court of subject matter jurisdiction over the murder and attempted murder charges. We disagree.

¶ 13 We review questions of law, including challenges to the court's subject matter jurisdiction, de novo. *People v. Sandoval*, 2016 COA 57, ¶ 14.

¶ 14 Subject matter jurisdiction concerns a court's authority to deal with the class of cases in which it renders judgment. *Wood v. People*, 255 P.3d 1136, 1140 (Colo. 2011). A court has subject matter jurisdiction "where it has been empowered to entertain the

type of case before it by the sovereign from which the court derives its authority." *Id.* In Colorado, article VI, section 9(1) of our constitution vests the district court with original jurisdiction in all criminal cases. *See Garcia v. Dist. Court,* 157 Colo. 432, 437-38, 403 P.2d 215, 218 (1965).

¶ 15 Still, it is not enough that the court generally has the authority to decide a particular class of case. *Adams Cty. Dep't of Soc. Servs. Child Support Enf't Unit v. Huynh,* 883 P.2d 573, 574 (Colo. App. 1994). Subject matter jurisdiction must be properly invoked before the district court can act. *Id.*; *see also Sandoval,* ¶ 53. In a criminal case, the court's jurisdiction is invoked by the filing of a legally sufficient complaint, information, or indictment. *People v. Huynh,* 98 P.3d 907, 910 (Colo. App. 2004).

¶ 16 An indictment is sufficient if it alleges sufficient facts to permit the accused to prepare an adequate defense and to assure that the defendant cannot be prosecuted again for the same crime. *People v. Edebohls,* 944 P.2d 552, 554 (Colo. App. 1996). Thus, if the indictment identifies the essential elements of the crime charged in the language of the statute, it is legally sufficient. *See People v. Harris,* 2016 COA 159, ¶ 70.

¶ 17    Sims does not challenge the sufficiency of the original indictment or dispute that it properly invoked the district court's jurisdiction. Instead, he contends that the superseding indictment replaced the original indictment, leaving the court with jurisdiction only over the updated sexual assault charge.

¶ 18    But Sims never explains why a prosecutor may not obtain a partially superseding indictment, as the prosecutor did here. He acknowledges that no statute, rule, or other authority prohibits the practice. And, because "each count in an indictment, though contained in a single instrument, is to be regarded as a separate indictment," *Gainey v. United States*, 318 F.2d 795, 797 (10th Cir. 1963), it follows as a logical matter that any one count can be superseded. *See People v. Edwards*, 658 N.Y.S.2d 415, 416 (N.Y. App. Div. 1997) ("A prosecutor has the freedom to obtain a new Grand Jury indictment to replace one that is pending, *or any count within it*, provided the new, 'superseding', indictment is filed prior to" trial or guilty plea.) (emphasis added).

¶ 19    Contrary to Sims's argument, the mere fact that the second indictment was labeled a "superseding" indictment rather than a "partially-superseding" indictment is not dispositive. The district

6

court's subject matter jurisdiction does not hinge on the particular appellation used by the prosecutor to describe a legal document. *See, e.g., Hawkins v. State Comp. Ins. Auth.*, 790 P.2d 893, 894 (Colo. App. 1990) ("A pleading or court document should not stand or fall on the appellation it is given by a litigant. It is the substance of a document that should control, rather than the title by which it is denominated."); *see also United States v. Blair*, 214 F.3d 690, 700-01 (6th Cir. 2000) ("[E]ven if the term 'superseding' was inappropriate to describe the second indictment, such a description is mere surplusage that can be ignored.").

¶ 20    Moreover, the district court found, based on its review of the grand jury transcripts, that the grand jury did not intend to withdraw the original murder and attempted murder charges and to replace them with a single charge of sexual assault. Rather, consistent with the rule that a superseding indictment can replace a single count of an original indictment, the district court determined that the grand jury had considered only the sexual assault charge. We see no reason to question that finding.

¶ 21    And finally, even if we assume that a superseding indictment ordinarily supplants an original indictment, the subsequent

7

indictment does not divest the court of subject matter jurisdiction over the original charges. *See United States v. Bowen*, 946 F.2d 734, 736 (10th Cir. 1991) ("We have found no authority which supports the proposition that a superseding indictment zaps an earlier indictment to the end that the earlier indictment somehow vanishes into thin air."); *see also Morrow v. Ignacio*, 183 F. App'x 653, 654 (9th Cir. 2006) ("There is no authority holding that a state court loses jurisdiction over the charges in the indictment when the prosecutor returns to the same grand jury to obtain a superseding indictment."). A superseding indictment does not "automatically render the original indictment ineffectual or a nullity." *Jones v. United States*, 99 A.3d 679, 689-90 (D.C. 2014). Rather, multiple indictments may coexist. *Bowen*, 946 F.2d at 736.

¶ 22 True, as Sims points out, the prosecution ordinarily elects one indictment on which it will proceed to trial. But election seems unnecessary where, as here, the second indictment amends or supersedes only part of the first. *See United States v. Stricklin*, 591 F.2d 1112, 1115 n.1 (5th Cir. 1979) (addressing both pending indictments on appeal because the government indicated it might

8

attempt to proceed on a combination of the original and superseding indictments).

¶ 23    In any case, the rule requiring election is designed to prevent a double jeopardy violation, *see Bowen*, 946 F.2d at 736; it does not implicate the court's subject matter jurisdiction. And Sims does not contend that the superseding indictment raised any double jeopardy concerns.

¶ 24    At best, then, Sims has identified some sort of procedural irregularity; he has not established that the court lacked subject matter jurisdiction. *See People v. Daniels*, 973 P.2d 641, 646 (Colo. App. 1998) (failure to file amended information did not deprive the court of jurisdiction where the defendant had notice of charges).

¶ 25    Procedural irregularities afford no grounds for reversal of a judgment unless the irregularities prejudiced the substantial rights of the defendant. *Oaks v. People*, 150 Colo. 64, 66, 371 P.2d 443, 445-46 (1962).

¶ 26    A grand jury found probable cause that Sims had committed first degree murder after deliberation, first degree felony murder, attempted first degree murder, and sexual assault (as defined by the 2012 statute). At Sims's request, the district court reviewed the

grand jury's probable cause determination and affirmed it. Another grand jury (or, possibly, the same grand jury) found probable cause that Sims had committed sexual assault under the 1994 version of the statute. At Sims's request, the district court reviewed that determination, too, and affirmed it.

¶ 27 Sims does not seriously dispute that he was on notice of the murder, attempted murder, and sexual assault charges as early as December 2012, more than two years before trial. On overwhelming evidence of guilt, a jury convicted Sims of all charges.

¶ 28 Under the circumstances, we discern no basis for vacating Sims's first degree murder and attempted murder convictions. *See United States v. Hickey*, 580 F.3d 922, 930 (9th Cir. 2009) ("[The defendant] was fairly on notice that he could be tried for any of the offenses contained in the third superseding indictment because all of the indictments remained pending until trial, the factual predicate remained the same, and the charges were not substantially broadened."); *see also United States v. Miner*, No. 3:11-cr-25, 2012 WL 529590, *3 (E.D. Tenn. Feb. 16, 2012) ("[N]o prejudice resulted to Defendant as a result of the multiple

indictments, and Defendant at all times had adequate notice of the precise nature of the charges against him.").

### III. The Sexual Assault Charge Was Not Barred by the Statute of Limitations

¶ 29  In 1994, when Sims raped J.G., the statute of limitations for sexual assault in violation of section 18-3-402 was ten years.  § 16-5-401(8)(a)(I), C.R.S. 1994.  However, section 16-5-401(8)(a.5) — enacted in 2001 and applicable to offenses committed after July 1, 1991 — eliminated the statute of limitations in certain sexual assault cases.  Ch. 283, secs. 1, 4, § 16-5-401(8)(a.5)(1), 2001 Colo. Sess. Laws 1057-59.

¶ 30  The statute provides that there is "no limit on the period of time during which a person may be prosecuted after the commission of [an] offense" if "the identity of the defendant or juvenile is determined, in whole or in part, by [DNA evidence] and . . . the offense has been reported to a law enforcement agency . . . within ten years after [its] commission."  § 16-5-401(8)(a.5), C.R.S. 2018.

¶ 31  Sims contends that section 16-5-401(8)(a.5) is inapplicable because his identity was not "determined" by DNA evidence.

According to Sims, the police had identified him as a possible suspect as early as 1995, and the DNA evidence merely confirmed their earlier suspicions. We are not persuaded.

¶ 32    We review de novo whether a specific provision of a statute of limitations applies to an offense. *People v. Shores*, 2016 COA 129, ¶ 11.

¶ 33    Our primary goal when interpreting a statute is to determine and give effect to the General Assembly's purpose and intent in enacting it. *People v. Hernandez*, 250 P.3d 568, 571 (Colo. 2011). Therefore, we look first to the plain language of the statute, giving words and phrases their plain and ordinary meanings. *Id.* Where the language is clear, we enforce the statute as written. *Shores*, ¶ 16.

¶ 34    Sims contends that DNA evidence "determines" a defendant's identity within the meaning of section 16-5-401(8)(a.5) only if the evidence is "instrumental in actually identifying" a "heretofore unknown" perpetrator. In effect, Sims reads the statutory term "determine" to mean "reveal that which was previously unknown." In the context of the statutory provision, however, we consider that definition too narrow. *See People in Interest of T.T.*, 2017 COA 132,

¶ 12 (in interpreting statutes, we must read words and phrases in the context of the entire provision).

¶ 35     "Determine" is defined as "to fix conclusively or authoritatively," or "to settle a question or controversy about." Webster's Third New International Dictionary 616 (2002). When combined with the phrase "in whole or in part," we construe the provision to require only that the DNA evidence contribute in some way to "settling" the question of the perpetrator's identity.

¶ 36     We are not persuaded by Sims's argument that we should construe the word "determines" narrowly, so as to avoid "vitiat[ing]" the "entire concept of a statute of limitations in sexual assault cases." To the contrary, we interpret the legislature's decision to modify "determine" with the phrase "in whole or in part" as evidence of its intent to vitiate the statute of limitations in every case (involving the enumerated statutes) where DNA evidence assists the police in "fixing conclusively" on a suspect. That, of course, is the legislature's prerogative. *Dove v. Delgado*, 808 P.2d 1270, 1274 (Colo. 1991) ("It is . . . clearly within the legislature's domain to amend statutes of limitations to shorten or lengthen the time after which certain actions shall not be brought.").

¶ 37    That the DNA evidence played some role in establishing Sims's participation in the crimes is undisputed.  Thus, we conclude that section 16-5-401(8)(a.5) applies.

### IV.    The District Court Did Not Err in Excluding Evidence of J.G.'s Prior Sexual Conduct

¶ 38    Sims gave pretrial notice, pursuant to the rape shield statute, section 18-3-407, C.R.S. 2018, of his intent to introduce evidence of J.G.'s prior sexual conduct.  The notice asserted that J.G.'s former roommate would testify that J.G. had consensual sex with a drug dealer named "Sparky" — which was Sims's nickname — in exchange for drugs shortly before her death, thus explaining the presence of Sims's DNA in her vagina.

¶ 39    At a pretrial hearing, the court ruled that the roommate's testimony was admissible only to the extent that it could establish a specific instance of sexual contact with Sims near the date of the murders.  In accordance with that ruling, the roommate was questioned during trial, outside the presence of the jury, to determine whether her testimony would meet the admissibility standard.

¶ 40    The roommate testified that she lived with J.G. for some time until July 1993, a year before the murders.  During that period, J.G. was using drugs.  The roommate knew of three dealers from whom J.G. obtained drugs.  One of the dealers went by the name Sparky.  J.G. did not have a job, and she would "prostitute herself" to get drugs.

¶ 41    The roommate had never met "Sparky" and did not know anything about him other than that he "came from the east side." The roommate did not specifically testify that J.G. had traded sex for drugs with any of her dealers or that J.G. ever had consensual sex with "Sparky," much less that she had done so close in time to the murders.  To the contrary, because the roommate had moved out of J.G.'s apartment almost a year before J.G.'s sexual assault and murder, she could not testify about J.G.'s sexual conduct during the relevant period.

¶ 42    The trial court determined that the roommate's testimony that J.G. had previously traded sex for drugs did not satisfy the statutory criteria for admissibility under the rape shield statute and excluded the evidence.

15

¶ 43    On appeal, Sims insists that the roommate's testimony falls within an exception to the rape shield law because it "suggested" that Sims's DNA was "deposited" in J.G.'s vagina and other orifices "during a consensual sexual encounter" before her murder.  We disagree.

¶ 44    We review a trial court's determination whether evidence falls within an exception to the rape shield statute for an abuse of discretion.  *People v. Harris*, 43 P.3d 221, 225 (Colo. 2002).  A court abuses its discretion if it misconstrues or misapplies the law or if its ruling is manifestly arbitrary, unreasonable, or unfair.  *People v. Vasseur*, 2016 COA 107, ¶ 12.

¶ 45    Although the rules of evidence generally favor the admission of evidence, the rape shield statute creates a presumption that evidence relating to a victim's sexual conduct is irrelevant to the criminal proceedings.  *People v. Melillo*, 25 P.3d 769, 773 (Colo. 2001).  The general prohibition on admission of such evidence is qualified, however, by three statutory exceptions.  Evidence is admissible under the rape shield statute if it is (1) evidence of the victim's or witness's prior or subsequent sexual conduct with the actor; or (2) evidence of specific instances of sexual activity showing

16

the source or origin of semen, pregnancy, disease, or any similar evidence of sexual intercourse offered for the purpose of showing that the act or acts charged were or were not committed by the defendant. § 18-3-407(1)(a)-(b). Even if sexual conduct evidence does not fall within one of these exceptions, the presumption of irrelevance can nevertheless be rebutted if (3) the defendant makes an offer of proof showing that the evidence is relevant to a material issue in the case. § 18-3-407(2); *see also Melillo*, 25 P.3d at 774. Evidence proffered under the third exception is subject to relevancy and prejudice limitations under CRE 401 and 403, *People v. Cook*, 2014 COA 33, ¶ 38, and the proponent of such evidence must establish the relevance and materiality of the sexual history evidence before trial, *People v. MacLeod*, 176 P.3d 75, 80 (Colo. 2008).

¶ 46     Evidentiary rules of relevancy are concerned with whether proposed evidence makes a fact of consequence more or less probable, and whether that probative value is substantially outweighed by any danger of unfair prejudice caused by the evidence. *Id.* at 80-81.

¶ 47    Sims's theory of defense was that he and J.G. had a consensual sexual encounter just before her murder, which explained why his semen was recovered from her vagina (and very likely her anus) right after she was killed. Relying on the first and third exceptions to the rape shield statute, Sims says that the roommate's testimony was admissible because it "suggested" that J.G. and Sims had a "prior sexual relationship."

¶ 48    The roommate's testimony, though, did not suggest that J.G. and Sims had a prior sexual relationship. The roommate could only say that J.G. had a dealer named "Sparky" and that, at some point in 1993, J.G. was "prostituting herself" for drugs. She did not link "Sparky" to Sims; she did not testify that J.G. traded sex for drugs with any of her dealers, including "Sparky"; and she did not say that J.G. and "Sparky" had ever engaged in consensual sex. (Evidence that J.G. was "prostituting herself" with unidentified men in exchange for drugs was surely not admissible. *See People v. Braley*, 879 P.2d 410, 415 (Colo. App. 1993).)

¶ 49    The roommate's testimony that J.G. had a dealer named "Sparky" and was "prostituting herself" for drugs in 1993 could not, on its own, have led to a reasonable inference that J.G. was

18

involved in a consensual sexual relationship with Sims during the period shortly before the murders.

¶ 50 And even if the roommate's testimony could have permitted the inference that J.G. and Sims had a "prior sexual relationship," that fact was not material by itself. To support Sims's theory of defense, that fact had to reasonably lead to the further inference that because J.G. and Sims had a prior sexual relationship, they had a consensual sexual encounter on or around July 12, 1994, thereby accounting for the presence of Sims's semen inside J.G.'s vagina. But "[p]resumption and inferences may be drawn only from facts established, and presumption may not rest on presumption or inference on inference." *People v. Ayala*, 770 P.2d 1265, 1268 (Colo. 1989) (quoting *Tate v. People*, 125 Colo. 527, 247 P.2d 665 (1952)); *People v. Donald*, 2018 COA 103, ¶ 24.

¶ 51 Thus, the roommate's testimony that J.G. was "prostituting herself" for drugs in 1993 did not make any fact of consequence more or less probable. The district court therefore did not abuse its discretion in excluding the evidence under the rape shield statute.

¶ 52 Because we are not persuaded that the roommate's testimony was relevant and admissible, we also conclude its exclusion did not

abridge Sims's right to present a defense. *See People v. Scearce*, 87 P.3d 228, 233 (Colo. App. 2003) (the right to present a defense requires only that the defendant be permitted to introduce all relevant and admissible evidence).

¶ 53    In light of our conclusion, we need not address Sims's argument that the district court erred in excluding the roommate's testimony as hearsay.

V.    Conclusion

¶ 54    The judgment of conviction is affirmed.

JUDGE J. JONES and JUDGE ASHBY concur.