21CA1982 Peo v Counterman 02-13-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 21CA1982
Jefferson County District Court No. 20CR1644
Honorable Lily W. Oeffler, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Michael David Counterman,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE FREYRE
Schock and Sullivan, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced February 13, 2025

Philip J. Weiser, Attorney General, Caitlin E. Grant, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Chelsea E. Mowrer, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Michael David Counterman, appeals the judgment of conviction and sentence entered on a jury verdict finding him guilty of first degree murder.  We affirm.

## I.    Background

¶ 2    On the evening of April 4, 2020, Counterman fatally shot Randi Ackerman outside of Ackerman's apartment.  Counterman, who was attending a party nearby at his girlfriend's house, was drinking in the backyard when he learned that Ackerman, his girlfriend's former boyfriend, drove past the front of the house.  Counterman heard his girlfriend yell, "That's my ex," after which point he got into his own truck and headed toward Ackerman's apartment.  Counterman said he went to Ackerman's apartment to "speak [his] piece" and tell Ackerman to stay away from his girlfriend.

¶ 3    The two got into a heated argument in the parking lot.  The argument became physical and Counterman "hit [Ackerman] in [the] chest and [swept] his legs," knocking Ackerman to the ground.  After the physical fight, Counterman said he walked back to his truck and heard Ackerman tell him to "turn around."  When he turned, he saw Ackerman with a gun at his side.  Counterman

1

claimed that he tried to turn and leave when Ackerman fired the gun at him and missed. Counterman said he then disarmed Ackerman and tried to leave with Ackerman's gun.

¶ 4 As Counterman opened his truck door, Ackerman grabbed him and pulled him away from the truck. Ackerman yelled for his gun back, to which Counterman responded, "No . . . I don't want to die tonight. Do you want to die tonight?"

¶ 5 Ackerman continued to attempt to pull Counterman out of his truck, at which point Counterman said he "[pulled] the trigger until it stopp[ed] firing." Once the gun stopped firing, Counterman felt Ackerman let go. Counterman said he dropped the gun and left, but the gun was never recovered.

¶ 6 Ackerman yelled for help. His girlfriend and several others came to his aid. Ackerman told them that Counterman had shot him. Once police and paramedics arrived, Ackerman was taken to the hospital.

¶ 7 Shortly thereafter, neighbors saw Counterman drive back to his girlfriend's house, and one of them overheard Counterman tell his girlfriend "I shot [Ackerman], I shot him." That neighbor then

called 911, and the police took Counterman and his girlfriend to the police station for questioning.

¶ 8 The prosecution charged Counterman with first degree murder and a jury convicted him. The trial court sentenced him to the custody of the Department of Corrections for life without the possibility of parole.

¶ 9 Counterman contends the trial court erroneously (1) denied his intervening cause defense and accompanying instruction as well as his non-deadly force self-defense jury instruction; (2) precluded expert testimony concerning the drugs and alcohol found in Ackerman's system; (3) admitted evidence that Counterman was part of a motorcycle club and lived in a house with weapons unrelated to the offense that should have been excluded under CRE 404(b); and (4) committed cumulative errors that deprived him of a fair trial. We address and reject each of his contentions and affirm the judgment.

## II. Intervening Cause

¶ 10 Counterman contends that because he presented credible evidence that Ackerman died from grossly negligent medical care,

the trial court erred by excluding his intervening cause defense and related jury instruction. We disagree.

## A. Additional Facts

¶ 11 Ackerman sustained gunshot wounds to the arm, legs, back, and chest. The wounds to his arm, legs, and back were superficial and nonfatal. The bullet that entered Ackerman's chest pierced his lungs. Several days later, Ackerman died from sepsis.

¶ 12 The parties offered conflicting expert opinions regarding Ackerman's perforated esophagus. The forensic pathologist testified that these injuries were consistent with Ackerman's bullet wound to the chest and that the resulting sepsis was a complication of this injury. By contrast, defense expert Dr. Michael Arnall opined pretrial that medical personnel caused the perforation during a later intubation and that delays in treating Ackerman with antibiotics resulted in Ackerman's respiratory failure and death.

¶ 13 Before trial, the defense moved to allow an intervening cause defense and submitted Dr. Arnall's affidavit and medical records as evidence of gross negligence. The prosecution responded with their own medical records and the opinions of the forensic pathologist

and treating physician that sepsis was caused by the gunshot wounds.

¶ 14      The trial court denied Counterman's motion and noted that Dr. Arnall assessed Ackerman based on his condition when he had already received significant medical treatment. The trial court found that the Ackerman's injuries, including the gunshot wound to his chest, "would have certainly caused his death with little or no medical treatment." After the supreme court denied Counterman's C.A.R. 21 petition on this issue, the case proceeded to trial and the trial court instructed the jury on intervening cause as follows:

> A defendant is not relieved of liability if the original wound would likely have been fatal without medical treatment. One who has inflicted a wound or injury upon another is criminally responsible for the victim's death even where different or more skillful medical treatment might have saved the victim's life.

¶ 15      After trial, Counterman moved for a new trial and argued, in part, that the trial court erred by not allowing evidence of intervening cause. The trial court denied the motion.

### B.      Standard of Review and Applicable Law

¶ 16      The right to due process and a fair trial guarantee defendants the right to present a defense. U.S. Const. amends. V, VI, XIV;

5

Colo. Const. art. II, §§ 16, 25.  Accordingly, trial courts must properly instruct the jury on every element of the crime charged, and the prosecution must prove each of those elements beyond a reasonable doubt.  *Griego v. People*, 19 P.3d 1, 7 (Colo. 2001).

¶ 17     As relevant here, to prove homicide, the prosecution must prove "that the defendant's conduct was the actual cause of death, in the sense that it began a chain of events the natural and probable consequence of which was the victim's death."  *People v. Saavedra-Rodriguez*, 971 P.2d 223, 225 (Colo. 1998); *People v. Gentry*, 738 P.2d 1188, 1190 (Colo. 1987); *Hamrick v. People*, 624 P.2d 1320, 1323-24 (Colo. 1981).  "[U]nder certain circumstances, the defendant may be relieved of liability for the death of the victim if there has been an independent intervening act."  *Saavedra-Rodriguez*, 971 P.2d at 225.  But only an intervening cause that is not reasonably foreseeable will relieve a defendant of liability.  *Id.* at 226.  Unlawful conduct that is broken by an independent intervening cause cannot be the proximate cause of injury to another.  *Gentry*, 738 P.2d at 1190; *People v. Calvaresi*, 534 P.2d 316, 319 (Colo. 1975), aff'd, 600 P.2d 57 (Colo. 1979).

¶ 18     An independent intervening cause "is an act of an independent person or entity that destroys the causal connection between the defendant's act and the victim's injury and, thereby becomes the cause of the victim's injury." *Saavedra-Rodriguez*, 971 P.2d at 225-26. "Three elements must be satisfied to establish an independent intervening cause sufficient to relieve a defendant of responsibility" for another's death or injury. *People v. Lopez*, 97 P.3d 277, 282 (Colo. App. 2004). First, the defendant must not participate in the intervening cause. *Id.* Second, the intervening cause must be one but for which the death or injury would not have occurred. *Id.* Finally, the intervening cause must not have been reasonably foreseeable. *Id.* "A foreseeable act is one that 'is likely enough in the setting of modern life that a reasonably thoughtful person would take account of it in guiding practical conduct.'" *Garcia v. Colo. Cab Co.*, 2023 CO 56, ¶ 22 (quoting *Taco Bell, Inc. v. Lannon*, 744 P.2d 43, 48 (Colo. 1987)). "[F]oreseeability is based on common sense perceptions of the risks created by various conditions and circumstances." *Id.* (quoting *Taco Bell*, 744 P.2d at 48). Because a defendant must satisfy all three elements to receive an intervening

7

cause instruction, his failure to establish one element deprives him of the affirmative defense. *Lopez*, 97 P.3d at 282.

¶ 19 In the case of medical treatment, mere negligence on the part of a physician is foreseeable and does not constitute a defense. *Calvaresi*, 534 P.2d at 318; *People v. Stewart*, 55 P.3d 107, 121 (Colo. 2002). However, "[g]ross negligence . . . is unforeseeable behavior that may serve as an intervening cause." *Stewart*, 55 P.3d at 121; *see People v. Sieck*, 2014 COA 23, ¶¶ 9–11.

¶ 20 Gross negligence is abnormal human behavior that constitutes "an extreme departure from the ordinary standard of care." *Lopez*, 97 P.3d at 282; *Calvaresi*, 534 P.2d at 319. Put another way, gross negligence is "willful and wanton conduct, that is, action committed recklessly, with conscious disregard for the safety of others." *Martinez v. People*, 2024 CO 6M, ¶ 14 (quoting *Hamill v. Cheley Colo. Camps, Inc.*, 262 P.3d 945, 954 (Colo. App. 2011)); *People v. Smoots*, 2013 COA 152, ¶ 10, aff'd sub nom. *Reyna-Abarca v. People*, 2017 CO 15. But even an intentionally tortious or criminal act will not immunize the defendant from liability if it was reasonably foreseeable. *Ekberg v. Greene*, 588 P.2d 375, 376 (Colo. 1978). Indeed, "[a] failure to provide or select the best treatment,

and therefore save the victim, should not relieve the original assailant of liability if the wound was of the type likely to result in death if little or no treatment had been provided." *Saavedra-Rodriguez*, 971 P.2d at 228. Moreover, for gross negligence to constitute a defense in a homicide case, "the maltreatment must also be the cause but for which death would not have occurred." *Id.* at 226.

¶ 21 An intervening cause defense is treated like an affirmative defense for the purpose of determining the quantum of evidence necessary to submit the issue to the jury. *Id.* at 228; *Smoots*, ¶ 9. Therefore, the defendant must produce a scintilla of evidence to warrant the instruction. *Saavedra-Rodriguez*, 971 P.2d at 228. However, it is the court, not the jury, that must determine, as a threshold matter, whether sufficient evidence supports the instruction. *Id.*

¶ 22 We review jury instructions de novo to determine whether the instructions, as a whole, accurately informed the jury of the governing law. *People v. Theus-Roberts*, 2015 COA 32, ¶ 18. If they do, the trial court enjoys substantial discretion in formulating the instructions and deciding whether additional instructions are

required.  *Id.*  We also review de novo whether sufficient evidence exists to support a requested jury instruction, reviewing the evidence in the light most favorable to giving the instruction. *Castillo v. People*, 2018 CO 62, ¶ 32; *People v. Silva*, 987 P.2d 909, 914 (Colo. App. 1999).  Additionally, we review a trial court's decision to give a particular jury instruction for an abuse of discretion.  *People v. Singley*, 2015 COA 78M, ¶ 40.  A trial court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair or is based on a misapplication of the law. *People v. Maloy*, 2020 COA 71, ¶ 54.

## C.    Analysis

¶ 23    Applying the three elements required to relieve a defendant of liability due to an intervening cause, we conclude that Counterman presented insufficient evidence to warrant an intervening cause instruction.

¶ 24    Even assuming, without deciding, that Counterman showed that he did not participate in the intervening cause and that medical personnel provided Ackerman grossly negligent care that was not foreseeable when his esophagus was perforated, we find *Saavedra-Rodriguez* instructive and conclude that Counterman

failed to present any evidence that Ackerman would have survived without treatment.

¶ 25     In *Saavedra-Rodriguez*, the defendant stabbed the victim in the chest. 971 P.2d at 224. The victim was taken to the hospital and later died. *Id.* The defendant then requested an intervening cause instruction and made an offer of proof that several medical practitioners would opine that the treating physician made errors in his diagnosis and treatment and unnecessarily delayed treatment, and that the victim would have had a better chance of survival given proper and timely treatment. *Id.* at 225. He did not, however, offer evidence that the substandard care was the cause of the victim's death. *Id.* Indeed, all the doctors would have testified that the cause of death was the stab wound inflicted by the defendant. *Id.* And the court held that grossly negligent medical care is not an intervening cause unless the "initial wound would not have been fatal without treatment." *Id.* at 227. The court concluded that the defendant failed to meet the foundational requirements necessary to present the intervening cause defense because while he offered evidence of improper medical care, he failed to show that the

victim's stab wound was unlikely to have killed the victim had little or no treatment been provided.  *Id.* at 228.

¶ 26     Here, no one disputes that the gunshot wound to Ackerman's chest was serious.  The record shows that upon admission to the emergency room, Ackerman required immediate intubation to assist with his breathing, due to the significant chest trauma.  Indeed, hospital staff believed that Ackerman would have died within an hour of the gunshot wound if he had not received treatment.  Ackerman then underwent bilateral surgeries to his chest from the blast wounds, as well as a partial lung resection.  The forensic pathologist testified that the gunshot went through Ackerman's lungs and esophagus and that death would have occurred had little or no treatment been provided.  The trial court found, and the record supports, that Counterman's conduct (the act of shooting) would have resulted in Ackerman's death if little or no treatment had been provided, including the delayed treatment of his sepsis.  *Saavedra-Rodriguez*, 971 P.2d at 227.

¶ 27     We are not convinced otherwise by Dr. Arnall's affidavit, which only addresses the result of the medical treatment rather than Counterman's act, the nature of the wound, the location of the

wound, and the natural and probable causes of the injury. *See id.* at 226-27. Indeed, Dr. Arnall opined that the esophagus was perforated after the initial surgeries when Ackerman had to be intubated again, that sepsis developed, and that delays in treating Ackerman's sepsis constituted gross negligence that resulted in death. However, Dr. Arnall never opined that Ackerman would have survived the chest wound without the treatment he received upon admission to the emergency room. Therefore, as in *Saavedra-Rodriguez*, Counterman "offered proof of improper medical care," rather than offering "any evidence that would show the victim's wound was unlikely to result in death had little or no treatment been provided." *Id.* at 228.

¶ 28    As the trial court noted, Counterman's defense, and Dr. Arnall's opinion in particular, was predicated on Ackerman's status "after receiving extensive medical care and surgery to repair the damage from the shooting, to include removal of part of his lung. Only after all of this has happened, does the defense opine gross negligence occurred and caused [Ackerman's] death." We agree and conclude that Counterman failed to produce sufficient evidence to support an intervening cause defense or accompanying instruction.

13

### III. Self-Defense Jury Instructions

¶ 29    Counterman next contends that he was entitled to a non-deadly force self-defense jury instruction that the court wrongly refused. We disagree.

#### A. Standard of Review and Applicable Law

¶ 30    The parties dispute preservation. While acknowledging that Counterman tendered a non-deadly force self-defense instruction, the People claim that he was required to do more by making arguments at the jury instruction conference. We disagree and conclude that tendering the instruction sufficiently preserved the issue for our review. *People v. Tardif*, 2017 COA 136, ¶ 10. We apply the standard of review set forth in the previous section.

¶ 31    If there is some evidence to show that the defendant acted in self-defense, the court must give a self-defense instruction. *Id.* at ¶ 20. The "some credible evidence" standard — sometimes referred to as the "some evidence," "any credible [even if highly improbable] evidence," "a scintilla of evidence," "a small quantum of evidence," and "any evidence standard," *Galvan v. People*, 2020 CO 82, ¶ 24 (citations omitted) — is "'exceedingly low' making [the] preclusion of an affirmative defense appropriate only when there is 'simply no

evidence . . . in th[e] record'" to support it, *People v. Jacobson*, 2017 COA 92, ¶ 15 (quoting *People v. Platt*, 170 P.3d 802, 806 (Colo. App. 2007)).  However, the jury should not be instructed "on abstract principles of law unrelated to the issues in controversy."  *People v. Knapp*, 2020 COA 107, ¶ 20 (quoting *Castillo*, ¶ 34).  The trial court must determine whether there is sufficient evidence to warrant an instruction on an affirmative defense and any exceptions to that defense.  *Castillo*, ¶ 34.

> [A] person is justified in using physical force upon another person in order to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he may use a degree of force which he reasonably believes to be necessary for that purpose.

§ 18-1-704(1), C.R.S. 2024.

¶ 32    A person may use deadly force only if, among other circumstances, there are reasonable grounds to believe that they are in imminent danger of being killed or of sustaining great bodily injury.  *See* § 18-1-704(1)-(2).  Whether physical force is properly considered "deadly" does not turn on the subjective intent of the person using the force, but rather on the "objective likelihood that,

15

in the absence of some intervening circumstance, a result will occur." *People v. Opana*, 2017 CO 56, ¶ 14.

¶ 33    Moreover,

> the assessment [of] whether or not physical force arguably used in self-defense constituted "deadly physical force" ceases to be a matter for the jury only where the credible evidence permits no other finding than that the physical force used by the defendant would normally be expected to, and in fact did, produce death.

*Id.* at ¶ 16.

## B.    Analysis

¶ 34    Counterman argues that the force he used against Ackerman was not deadly force because, as he testified, he was not facing Ackerman at the time of the shooting, and "most of the shots caused superficial wounds" to Ackerman's legs, arms, and back. He argues this was sufficient to support a non-deadly force self-defense instruction and to show that the force he used would not be expected to produce death. We disagree and find *Opana* dispositive.

¶ 35    Counterman admitted firing the gun "until it stopped firing" and presented nothing to show that multiple gunshots would not normally be expected to produce death. The fact that some shots proved nonfatal does not change the fact that the chest wound was

fatal. Indeed, hospital staff believed that without medical intervention, Ackerman would have died within an hour of the gunshot wound to his chest. Therefore, we discern no dispute about whether the force used by Counterman was typical of what "a normal or typical person would use only if he intended to produce death" and instead conclude that Counterman's multiple shots "would normally be expected to, and in fact did, produce death." *Opana*, ¶¶ 15, 16. Accordingly, we discern no error in the trial court's decision not to instruct the jury on non-deadly self-defense.

## IV. Expert Testimony

¶ 36 Counterman next contends the trial court abused its discretion by not admitting expert testimony that Ackerman had ingested cocaine and alcohol before the shooting. We disagree and discern no abuse of discretion.

### A. Additional Facts

¶ 37 Ackerman's toxicology report upon admission to the hospital revealed that he had alcohol, cocaine, and THC in his system. The autopsy report also noted that blood tests revealed "recent cocaine use." The prosecution filed a motion to exclude this evidence as

irrelevant, and the court granted the motion, subject to reconsideration if circumstances changed.

¶ 38    The defense endorsed self-defense and Sarah Urfer as an expert in toxicology.  Urfer opined that "a person such as [Ackerman] could have displayed emotional volatility, emotional lability, and aggression leading to a verbal altercation and physical violence while under the influence of these drugs as described."

¶ 39    At a pretrial conference, the trial court asked whether the defense intended to call Urfer at trial and counsel said, "We haven't decided yet."  The trial court reserved ruling on the issue until "Urfer is . . . brought forward as a witness."  The prosecutor noted that Urfer was endorsed as an expert and "her opinion suggests that somebody could be more aggressive if they have cocaine in their system."  However, Urfer also noted that the effects of cocaine wear off within a couple of hours, and the prosecutor argued that "[h]er opinion is based entirely on the substances themselves, and because the metabolites are so — they're suggestive of use that is so far removed from our incident, it's just not relevant, and it would prejudice the jury to hear that potentially he had used cocaine that day."  The prosecutor also argued that "the existence of metabolites

18

doesn't suggest that [Ackerman] was aggressive at the time of the incident, and Ms. Urfer specifically cannot tie her opinion to any indication in the evidence that [Ackerman] was aggressive." Defense counsel responded, "I think they should be able to consider it, but I can't disagree with what counsel said that Urfer reported."

¶ 40     Ackerman's blood sample was collected on April 4, 2020, at 10:19 p.m.  The test results found cocaine metabolites at a level such that Urfer thought the cocaine "would have been taken hours prior to this incident."

¶ 41     The court ultimately precluded Counterman from cross-examining the forensic pathologist on Ackerman's intoxication, and it also precluded Urfer's testimony, noting that Urfer referenced possible behaviors the substances could cause, but "she doesn't relate it to the case itself."  It also noted that the presence of cocaine metabolites in Ackerman's system did not "provide the Court with [a] sufficient basis to allow simple speculation on the part of the expert to say how possibly something could have impacted at some point in time."  The trial court found "just use of the substance alone without more would simply be prejudicial without providing a real scientific basis to Ms. Urfer's statements."

¶ 42    In denying Counterman's motion for a new trial based on this issue, the court again found that Urfer's testimony "was vague and inconclusive," "didn't give sufficient information for a jury to evaluate wisely," and "indicate[d] disparagement of the victim for no reason."

### B.    Standard of Review and Applicable Law

¶ 43    We review the admission of expert witness testimony for an abuse of discretion and "will reverse only when that decision is manifestly erroneous." *People v. Cooper*, 2021 CO 69, ¶ 44 (quoting *People v. Rector*, 248 P.3d 1196, 1200 (Colo. 2011)).

¶ 44    To determine whether such testimony is admissible, the trial court should "focus on the reliability and relevance of the proffered evidence." *People v. Shreck*, 22 P.3d 68, 70 (Colo. 2001). The court must determine "(1) the reliability of the scientific principles [involved], (2) the qualifications of the witness, . . . (3) the usefulness of the testimony to the jury," and (4) whether the evidence satisfies CRE 403. *Id.* A trial court's "CRE 702 determination must be based upon specific findings on the record as to the helpfulness and reliability of the evidence." *Id.* at 78.

¶ 45   The court "must also issue specific findings as to its consideration under CRE 403 as to whether the probative value of the evidence is substantially outweighed by its prejudicial effect." *Id.* Absent such specific findings "or a record not only supporting admission but virtually requiring it or precluding any reasonable dispute as to the basis of the court's admission, the trial court must be considered to have abused its discretion in admitting expert testimony." *Ruibal v. People*, 2018 CO 93, ¶ 14.

¶ 46   A trial court's decision to admit expert testimony is reviewed under the nonconstitutional harmless error standard. *Id.* at ¶ 17; *People v. Wilson*, 2013 COA 75, ¶ 24. An error is harmless if a reviewing court can say with fair assurance that, in light of the entire record, the error did not substantially influence the verdict or impair the fairness of the trial. *Wilson*, ¶ 24. Reversal is required only if the error affects the substantial rights of the parties. *Hagos v. People*, 2012 CO 63, ¶ 12.

## C.   Analysis

¶ 47   As Counterman concedes, Urfer's qualifications and expertise were not at issue. Rather, the court found that her findings were not helpful to the jury because she could not determine or opine on

the level of cocaine in Ackerman's blood at the time of the offense. The court noted that "[w]e don't know when — if [Ackerman] used cocaine that day, when it would have happened. We know that our expert has said that cocaine wears off in a couple of hours." Urfer acknowledged that her analysis was based on "limited information" and indicated that she could not "assign any of these impacts to the victim."

¶ 48    Urfer believed the cocaine "would have been taken hours prior to this incident." Therefore, we perceive no abuse of discretion in the trial court's determination that Urfer's testimony would not have helped the jury determine whether cocaine affected Ackerman at the time of the offense and that it was therefore irrelevant. *See* CRE 401, 402. Moreover, the trial court acted within its discretion in finding that any minimum probative value of this evidence was outweighed by the danger of unfair prejudice by casting Ackerman as a drug user, an issue not relevant to the case.

¶ 49    Accordingly, we discern no abuse of discretion in the court's preclusion of this evidence.

## V. Motorcycle Club and Firearms Evidence

¶ 50 Counterman next contends that the trial court erroneously admitted evidence of his membership in the Gringos Motorcycle Club and evidence that he possessed firearms and ammunition. We disagree.

### A. Additional Facts

¶ 51 Counterman moved in limine to preclude any reference to his affiliation with a motorcycle club called "Gringos Motorcycle Club," as well as any testimony or evidence of the ammunition and guns found at his girlfriend's home where they both lived. He argued that the "mere mention of [his] affiliation with the Gringos Motorcycle Club, an 'outlaw motorcycle gang', would create unfair prejudice" and argued the same for the admission of the guns and ammunition found at his home. Separately, Counterman requested notice of any potential CRE 404(b) evidence the prosecution intended to admit.

¶ 52 The prosecutor stated that the police found .357 revolver rounds in the house but found no revolver; that the bullet found in Ackerman was consistent "with a .357 Magnum round"; that the prosecution believed Ackerman was killed with a revolver because

23

no shell casings were found at the scene; that a revolver holster was recovered from the house; and that none of the three other firearms found in the house could have fired revolver rounds. The murder weapon was never recovered by the police. The prosecutor also argued that possessing guns is not inherently prejudicial. Further, receipts for two of the guns showed they were owned by Counterman's girlfriend.

¶ 53    The trial court found the firearms and ammunition satisfied CRE 401 and 403. Specifically, the court found that "it makes it more probable than not that the prosecution's theory is supported that [Counterman] used this gun, shot [Ackerman], and then disposed of the gun, leaving ammunition in the home that could also fit the gun." The court limited the evidence and determined that photographs could be used but that the guns themselves could not be admitted. The court also noted, "If there's a limiting instruction being requested with regard to any kind of prejudice about having other guns in the house, I'd certainly take a look at that, give me an idea of what you would be requesting," noting that it would consider "something clarifying the fact that two of the guns are registered to a different individual."

¶ 54    Concerning the motorcycle club membership, the trial court noted that unless there was a significant nexus between a defendant's membership in a gang and the crime, it would not allow any discussion of gang affiliation or membership at trial. The court explained that Counterman's membership in the motorcycle club was entwined with various witness descriptions of him but said it would not allow such membership to be used to argue that he committed murder. The court ordered that no one could refer to the Gringos Motorcycle Gang as a "motorcycle gang "and could only refer to it as a "club" or "group." The court found no "evidential reason" to allow discussion of the "gang."

¶ 55    In a later hearing, Counterman expressed further concerns, and the trial court asked the prosecution to submit copies of evidence that included references to the motorcycle club. The court then addressed the issue again at a third hearing. It decided it would only permit mention of the motorcycle club "when necessary" and would rule as the evidence was admitted. The court told defense counsel, "[I]f you see something coming up that you're concerned that there is going to be discussion of the Gringos or connection of the Gringos . . . , let the Court know . . . ." The court

ordered that while there would not be an absolute prohibition, the prosecution would "have limited reference to [the motorcycle club] only when necessary for a witness to be able to testify and [for it to] make sense."

¶ 56     Both the prosecution and the trial court agreed to consider a limiting instruction if Counterman proposed one, but he never did.

¶ 57     The relevant motorcycle club evidence heard by the jury included the following:

(1)     During opening statements, the prosecutor said, "But the defendant and [his girlfriend], they decided to throw a party.  He was a part of the Gringos Motorcycle Club, and they had a gathering on April 4th, 2020."  The defense did not object.

(2)     Also during opening statements, defense counsel said, "Oh, I was with my club brother.  Oh, we went to [his] house."

(3)     During Adam Wilson's testimony, the prosecutor asked whether he and Counterman were a part of the "Gringos Motorcycle Club together" and he answered, "No, I'm not

a member. I haven't had any contact with the Gringos in about a year."

(4) A Snapchat video of the party was admitted into evidence and showed references to motorcycle club paraphernalia.

(5) Pictures of Ackerman wearing "Gringos Motorcycle Club" labeled clothing and other motorcycle club paraphernalia was admitted into evidence.

(6) Counterman testified that he joined a motorcycle club in 2017 and met his girlfriend through one of the club member's wives. On cross-examination, he said some party guests were members of the motorcycle club. He also told police about the club when asked about his relationship to Adam Wilson.

¶ 58 The trial court admitted this evidence and found it was relevant to identity and was part of the res gestae of the case. It further found that the firearms and ammunition were relevant to show that a .357 revolver was missing.

### B. Standard of Review and Applicable Law

¶ 59 All relevant evidence is admissible unless otherwise provided by constitution, statute, or rule. CRE 402. Relevant evidence is

that evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." CRE 401. Relevant evidence can be excluded, however, if its probative value is substantially outweighed by the danger of unfair prejudice. CRE 403.

¶ 60 Additionally, relevant evidence can be excluded if it is used to prove the character of a person to show that he acted in conformity with that character on a particular occasion. CRE 404(b). Notwithstanding these limitations on the admissibility of relevant evidence, evidence of other crimes, wrongs, or acts is admissible if used for purposes independent of an inference of bad character such as proving motive, opportunity, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. *Id.*

¶ 61 We review a court's evidentiary ruling for an abuse of discretion. *People v. Sims*, 2019 COA 66, ¶ 44. A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair or when it misapplies the law. *Id.*

¶ 62 The trial court's ruling rested in part on the res gestae doctrine, which the Colorado Supreme Court abolished in 2022.

*See Rojas v. People*, 2022 CO 8, ¶¶ 40-41.  This change occurred after Counterman's trial, but while his direct appeal was pending, and is therefore proper for us to consider.  *See People v. Morse*, 2023 COA 27, ¶ 51.  Accordingly, we review the court's ruling under *Rojas.*

¶ 63    In *Rojas*, the Colorado Supreme Court established a framework requiring courts to first determine whether the evidence at issue is intrinsic or extrinsic to the crime charged.  *Rojas*, ¶ 44.  Intrinsic acts are those that (1) directly prove the charged offenses or (2) occurred contemporaneously with the charged offenses and facilitated their commission.  *Id.* at ¶ 52.  They are not "other" acts and, therefore, fall outside the scope of CRE 404(b).  *Id.*  If uncharged misconduct evidence is extrinsic to the charged offense and suggests bad character, it is admissible only as provided by CRE 404(b) and only after completing the analysis required by *People v. Spoto*, 795 P.2d 1314, 1318 (Colo. 1990).

¶ 64    The parties dispute preservation, but we need not resolve this dispute because, even if preserved, we discern no abuse of discretion in the court's limited admission of this evidence.

## C.   Analysis

¶ 65    We first conclude that the ammunition evidence is intrinsic to the charged offense and that the court correctly evaluated its admissibility under CRE 401 and CRE 403, for three reasons. First, we reject Counterman's assertion that the evidence was not part of the commission of the crime.  No one disputes that Ackerman was shot with a .357 round of ammunition and that no semi-automatic weapon shell cases were recovered from the shooting location.  Therefore, unlike *Kaufman v. People*, 202 P.3d 542, 554-55 (Colo. 2009), where the supreme court found that the possession of knives and brass knuckles, weapons dissimilar to the murder weapon, constituted bad character evidence, the presence of such ammunition where Counterman lived made it more probable than not that he was the shooter and is therefore relevant to identity.  CRE 401.  Second, Counterman's possession of the ammunition occurred contemporaneously with the crime charged and facilitated its commission, thereby exempting it from a CRE 404(b) analysis.  Third, we reject Counterman's criticism of the trial court for failing to give a limiting instruction, because the record

shows the court offered to do so if requested.  Counterman never requested the instruction.

¶ 66    To the extent the firearms evidence is extrinsic, we discern no abuse of discretion in its admission, for three reasons.  First, we conclude it has some minimal relevance because the fact that none of the three firearms in the home could fire the .357 ammunition made it more likely that the weapon capable of firing such ammunition had been discarded.  Second, ownership of a firearm does not constitute a "bad act" that required review under CRE 404(b), and nothing in the record shows that the presence of these firearms was illegal.  Third, the record shows that two of the three firearms were registered to Counterman's girlfriend, and the owner of the third firearm was never identified.  Under these facts, we discern no abuse of discretion in the court's admission of this evidence.

¶ 67    We agree with Counterman that the motorcycle club evidence is extrinsic to the crime charged, but we discern no error in the court's admission of it because it does not suggest bad character. *See Rojas*, ¶ 52 ("[I]f extrinsic evidence does not suggest bad character, Rule 404(b) does not apply . . . .").  As admitted, this

evidence served only to explain how Counterman knew a witness, how the attendees at the party knew one another, and the content of some images. And as with the firearms and ammunition evidence, the court offered to provide a limiting instruction if requested, but Counterman never requested one.

¶ 68 Additionally, we are not persuaded that *People v. Trujillo*, 2014 COA 72, requires a different result. The Trujillo division noted that "gang-related evidence must be admitted with care." *Id.* at ¶¶ 71-72 (quoting *People v. Morales*, 966 N.E.2d 481, 492 (Ill. App. Ct. 2012)). The court did just that by specifically precluding any reference to "gangs," which would have implied bad character. Moreover, for the reasons explained above, we find this case distinguishable from Kaufman. Finally, we note that the prosecution never argued Counterman's club membership as evidence of his guilt and conclude that the evidence was "not so shocking that [its] probative value was outweighed by the likelihood that [it] would inflame the passions of the jury or cause them 'to abandon their mental processes and give expression to their emotions.'" *People v. Thorpe*, 641 P.2d 935, 943 (Colo. 1982) (quoting *Archina v. People*, 307 P.2d 1083, 1095 (Colo. 1957)).

## VI.  Cumulative Error

¶ 69    Counterman last contends that the alleged errors, when taken together, show that he did not receive a fair trial.

¶ 70    The cumulative error doctrine applies when "the cumulative effect of [multiple] errors and defects substantially affected the fairness of the trial proceedings and the integrity of the fact-finding process." *Howard-Walker v. People*, 2019 CO 69, ¶ 24 (quoting *People v. Lucero*, 615 P.2d 660, 666 (Colo. 1980)).

¶ 71    However, because we have found no errors, we necessarily conclude the cumulative error doctrine does not apply. *See People v. Villa*, 240 P.3d 343, 359 (Colo. App. 2009) (cumulative error analysis is required only when multiple errors have been identified).

## VII.  Disposition

¶ 72    The judgment is affirmed.

JUDGE SCHOCK and JUDGE SULLIVAN concur.