22CA2222 Peo v West 07-24-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA2222
City and County of Denver District Court No. 20CR20005
Honorable Christopher J. Baumann, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Dwan K. West,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE BERNARD*
Kuhn and Moultrie, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 24, 2025

---

Philip J. Weiser, Attorney General, Cata A. Cuneo, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Joseph Chase, Alternate Defense Counsel, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1    A jury convicted defendant, Dwan K. West, of second degree murder and illegal discharge of a firearm, and the trial court sentenced him as a habitual offender.  He appeals.  We affirm.

I.    Background

¶ 2    Defendant had a beef, which may or may not have been gang-related, with a woman named C.F.  At the end of May 2020, they were involved in a confrontation in a store.  C.F. told one of her companions to shoot defendant, using a racial epithet.  The companion did so, wounding defendant in the calf.

¶ 3    The next day, there was another encounter and another altercation.  C.F. again ordered a companion to shoot defendant, using the same racial epithet.  The companion fired, wounding defendant twice in his shoulder.

¶ 4    At this point, defendant said that he was "terrified" because there had been "two attempts on [his] life."  In addition to getting shot twice, he and his family had been "attack[ed]" at their apartment complex, and they therefore could not go home.  Their lives were "in danger."

¶ 5    In mid-June, defendant and his family drove to pick up an order from a food truck on Colfax Avenue.  His wife parked blocks

1

away from the truck, and, leaving his family in his car, he walked toward the truck. He carried a pistol in his hand, and its safety was off. He was "in fear of my life as well as my stepkids' life, my common-law wife's life, as well as my close friends, after two attacks have already been made on my life."

¶ 6 According to defendant, he saw C.F. She once again, using the same racial epithet, instructed the man with her, A.F., to shoot defendant. (There was no evidence that A.F. had been present at either of the two prior shootings.)

¶ 7 Defendant saw A.F. pull out a gun, rack it, and point it at him. Defendant thought he was "getting ready to die that day. I may not make it home. I might not see my family again . . . . [I]f I don't act right now, I'm possibly about to die." It was him or A.F.

¶ 8 Defendant fired six shots, but A.F. did not fire any. One bullet struck A.F. A.F. fell, and, defendant said, A.F.'s gun clattered to the ground. Defendant sprinted away. He later said that he was acting in self-defense.

¶ 9 A.F. lingered for several weeks until he died.

¶ 10 There were some holes in defendant's story.

2

¶ 11    The shooting was captured on video by an onlooker. It showed defendant walking up to the food truck slowly, then accelerating toward A.F., and then shooting him.

¶ 12    The gun that A.F. supposedly had was never recovered; the only evidence of a firearm at the scene was shell casings from defendant's gun. A detective testified that he did not "encounter anything that might suggest that [A.F.] was armed at the time that he was shot," and he did not find evidence of any altercation preceding the shooting.

¶ 13    The food truck owner did not hear any threats, see any weapons, or observe any fighting before defendant shot A.F. No one said anything to defendant before he opened fire.

¶ 14    Rather, the food truck owner saw defendant, who was dressed all in black and wearing the hood from his hoodie over his head, walk swiftly by the truck and start to fire his handgun. The owner saw some muzzle flashes, and he then saw defendant walk swiftly away.

¶ 15    The prosecution charged defendant with first degree murder, illegal discharge of a firearm, first degree assault, and six counts of

possession of a weapon by a previous offender.  At trial, the only issue was whether defendant acted in self-defense.

## II.     Evidence of Self-Defense

¶ 16     Defendant contends that the court's ruling excluding certain evidence of self-defense was erroneous, and the court's decision deprived him of his constitutional right to present a defense.  We disagree.

## A.     Additional Background

¶ 17     At trial, defendant testified that, after he had been shot in the calf and shoulder, and a couple of weeks before he shot A.F., he learned that "someone had a hit on [him]."  He testified that a friend had sent him a text message of a Facebook post containing his picture, bearing the caption "SOS."  Defense counsel wanted to introduce this post into evidence.

¶ 18     The prosecutor promptly objected, and the court dismissed the jury to discuss the objection.  Defense counsel said that "SOS" meant "shoot-on-sight."  The Facebook post, counsel continued, therefore supported defendant's self-defense claim because it helped explain his fearful state of mind shortly before the shooting at the food truck.

¶ 19 The prosecutor responded: "The fact that someone out on the internet might have posted a hit on him, might have posted this message and the way that [defendant] feels about that" is irrelevant because "they have to be able to show that there's a connection to [A.F.] in this case and that's what caused the imminent fear. They haven't done that at all."

¶ 20 When asked about the connection between the Facebook post and A.F., defense counsel said that "[i]t's my understanding that [the post] is attributed to potentially the Bloods," a criminal gang, because the Facebook post "says CMGB, which is Crenshaw Mafia Gangster Bloods[,] SOS." (C.F. and A.F. were both allegedly members of this gang.)

¶ 21 "[B]ut," defense counsel said, "I don't want to get into that." Instead, counsel "want[ed] to keep it limited" to the SOS component of the Facebook post "so we don't open the door to the gang stuff." (The parties agreed before trial that they would not go into defendant's or A.F.'s alleged gang affiliations.)

¶ 22 The court decided that it would not admit defendant's testimony about the Facebook post:

My concern is based on the offer of proof from [d]efense that there is no connection or nexus to the shooting at the food truck. And evidence that the defendant is on a, I guess, heightened state of alert in general because of a [Facebook post] that was relayed to him by an acquaintance without any connection to [A.F,] or [C.F.] or otherwise is, in my opinion or judgment, irrelevant and excludable under [CRE] 401, 402. . . .

### B.    Standard of Review and Applicable Law

¶ 23    "We review a trial court's evidentiary rulings for abuse of discretion." *Nicholls v. People*, 2017 CO 71, ¶ 17. A trial court abuses its discretion when its decision is manifestly arbitrary, unreasonable, unfair, or is based on a misunderstanding or misapplication of the law. *People v. Thompson*, 2017 COA 56, ¶ 91.

¶ 24    Evidence is relevant if it tends to make a fact of consequence more or less probable. CRE 401. "Evidence which is not relevant is not admissible." CRE 402.

¶ 25    A trial court's erroneous evidentiary ruling may amount to constitutional error if it deprives the defendant of a meaningful opportunity to present a complete defense. *People v. Conyac*, 2014 COA 8M, ¶ 93; *see also Krutsinger v. People*, 219 P.3d 1054, 1062 (Colo. 2009)("[T]he standard or test for assessing whether a

defendant's right to confront or present a defense has been violated by evidentiary rulings is clearly dependent upon the extent to which he was permitted to subject the prosecutor's case to 'meaningful adversarial testing.'" (quoting *Crane v. Kentucky*, 476 U.S. 683, 691 (1986))). "A defendant's right to present a defense is violated only where the defendant was denied virtually his only means of effectively testing significant prosecution evidence." *Conyac,* ¶ 93.

## C. Analysis

¶ 26 Defendant contends that the court erred when it excluded his testimony about the Facebook post. He asserts that such testimony was relevant to the issue of whether he acted in self-defense because it made his reasonable belief in imminent danger more probable than it would have been without the testimony. *See* § 18-1-704(1), (2)(a), C.R.S. 2024 (a person is justified in using deadly force upon another person to defend himself from that person if, among other things, he has reasonable ground to believe that he is in imminent danger of being killed or receiving great bodily injury). He reasons that C.F. had told someone to shoot him on two previous occasions, "so his belief in imminent danger would

obviously increase once he realizes [C.F.]'s people were putting out a message to shoot him on sight."

¶ 27    But defense counsel chose not to present evidence of gang affiliation, which included evidence of who "C.F.'s people" were. Without such evidence, defendant's testimony about the Facebook post would not logically relate to the issue of self-defense because it did not make it more probable that defendant feared imminent danger of being shot by A.F. at the food truck.  *Cf. People v. Jimenez,* 217 P.3d 841, 866 (Colo. App. 2008)(the usefulness of testimony, for purposes of relevance, "hinges on whether there is a logical relation between the proffered testimony and the factual issues involved in the case." (quoting *People v. Ramirez,* 155 P.3d 371, 379 (Colo. 2007))).

¶ 28    Indeed, defendant concedes as much by asserting in his opening brief that his testimony about the Facebook post "made it more probable that [he] believed that he was in danger *at any time and any place.*"  (Emphasis added.)  This is insufficient to establish relevance because, to conclude that defendant was legally authorized to use deadly physical force upon another person, the jurors needed to find that defendant (1) used that deadly physical

8

force "in order to defend himself . . . from what he reasonably believe[d] to be the use or imminent use of unlawful physical force by that other person," and (2) "ha[d] a reasonable ground to believe, and [did] believe, that he . . . [was] in imminent danger of being killed [by] or of receiving great bodily injury" from that other person. *See* § 18-1-704(1), (2)(a). Without evidence indicating that A.F. was an intended recipient of the Facebook post, the post, by itself, did not show that defendant (1) reasonably believed that A.F. would use, or was about to use, unlawful physical force against him, or (2) had reasonable grounds to believe, and did believe, that A.F. was imminently about to kill him or inflict great bodily injury on him. In other words, the gang evidence that counsel declined to introduce would have linked the Facebook post and the reasonableness of defendant's alleged belief that A.F. was going to try to kill him.

¶ 29     We therefore conclude that the record supports the court's determination that evidence about the Facebook post was irrelevant under CRE 401 and 402. As a result, the court's decision to exclude the evidence was not manifestly arbitrary, unreasonable, unfair, or based on a misunderstanding or misapplication of the law. *See Thompson*, ¶ 91.

9

¶ 30    Because the evidence of the Facebook post was not relevant, it was not admissible. CRE 402 ("Evidence which is not relevant is not admissible."). Defendant therefore could not use it to support his self-defense claim because he did not "have an unfettered right to offer [evidence] that [was] incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410 (1988).

¶ 31    We further conclude that the exclusion of the evidence concerning the Facebook post did not deprive defendant of his constitutional right to present a defense. That right "requires only that the accused be permitted to introduce all *relevant and admissible* evidence." *People v. Scearce*, 87 P.3d 228, 233 (Colo. App. 2003)(emphasis added); *accord People v. Sims*, 2019 COA 66, ¶ 52. "[T]he right to present a defense does not guarantee a defendant a right to question witnesses in violation of the rules of evidence . . . ." *Scearce*, 87 P.3d at 233.

### III.    Defendant's Habitual Criminal Sentence

¶ 32    Defendant raises two issues concerning his habitual criminal sentence. First, he asserts that the court did not conduct an adequate abbreviated proportionality review. Second, he submits

10

that, applying *Erlinger v. United States*, 602 U.S. 821 (2024), a jury, instead of the court, should have decided factual questions such as whether defendant's prior convictions had been separately brought and tried, whether defendant was the person who had been convicted in those prior cases, and whether the prior crimes were "eligible" as predicate convictions. Because a jury did not make those decisions, he continues, we should reverse his habitual criminal sentence and remand the case to the court for sentencing within the statutory range for second degree murder. We disagree with both assertions.

### A. Gross Disproportionality

#### 1. Additional Background

¶ 33     The prosecution charged defendant as a habitual criminal based on six prior felony convictions: aggravated robbery, three theft convictions, possession of a weapon by a previous offender, and providing false information to a pawnbroker. At the habitual criminal evidentiary hearing, the prosecution presented evidence that defendant had committed these six offenses; his aggravated robbery conviction had involved the use of a deadly weapon; and, as to one of his theft convictions, the prosecution had originally

11

charged him with burglary, assault, menacing, theft, and robbery because the circumstances involved entering a residence and strangling someone.

¶ 34    The court determined that the prosecution had proven each of the prior felonies and adjudicated defendant a habitual criminal under section 18-1.3-801(2)(a)(I), C.R.S. 2024.  It imposed sentences of ninety-six years for the second degree murder conviction and twelve years for the illegal discharge of a firearm conviction, to be served concurrently.  *See* § 18-1.3-801(2)(a)(I)(A); § 18-1.3-401(1)(a)(V.5)(A), C.R.S. 2024.

¶ 35    The court then conducted an abbreviated proportionality review of defendant's sentence, finding that the second degree murder conviction, the illegal discharge of a firearm conviction, and the aggravated robbery conviction were all grave and serious.  The court said:

> Given that this is a second[]degree murder case, given the history that's been described today during the hearing, including a prior aggravated robbery offense, also three convictions for felony theft, also a conviction for possession of a weapon by a previous offender, the [c]ourt does not find that the sentence of [ninety-six] years is grossly

12

> disproportionate. And, therefore, the [c]ourt
> will decline to reduce that sentence.

### 2. Standard of Review and Applicable Law

¶ 36    We review de novo whether a sentence is grossly disproportionate in violation of the constitutional protection against cruel and unusual punishment. *Wells-Yates v. People*, 2019 CO 90M, ¶ 35.

¶ 37    In evaluating whether a sentence is grossly disproportionate, a court must conduct an abbreviated proportionality review by comparing the gravity or seriousness of the offense and the harshness of the penalty. *Id.* at ¶ 7. In the habitual criminal context, "[a]s to each sentence, the inquiry is whether the corresponding triggering offense and the predicate offenses, considered together, are so lacking in gravity or seriousness as to suggest that the sentence is grossly disproportionate." *Id.* at ¶ 24.

¶ 38    For crimes that have not been designated as per se grave and serious offenses, the court considers "the harm caused or threatened to the victim or society" and "the culpability of the offender" to determine whether a crime is grave and serious. *Id.* at ¶ 12 (quoting *Solem v. Helm*, 463 U.S. 277, 292 (1983)). "This

analysis generally requires a consideration of the facts and circumstances underlying the defendant's conviction." *People v. Caime*, 2021 COA 134, ¶ 43. The court should also consider "any relevant legislative amendments enacted after the dates of those offenses, even if the amendments do not apply retroactively." *People v. McRae*, 2019 CO 91, ¶ 13.

¶ 39 If the abbreviated proportionality review "does not give rise to an inference of gross disproportionality, the proportionality challenge fails and the sentence must be upheld." *Wells-Yates*, ¶ 8.

### 3. Analysis

¶ 40 Defendant concedes that the court properly found his second degree murder conviction, his illegal discharge of a firearm conviction, and his aggravated robbery conviction were all grave and serious. But he asserts that we must remand for a new abbreviated proportionality review because the court did not conduct a "refined analysis" of his remaining predicate offenses — namely, the three theft convictions, the possession of a weapon by a previous offender conviction, and the providing false information to a pawnbroker conviction. As we understand his argument, he submits that, if the court had considered the underlying facts of

these predicate offenses and any relevant legislative amendments to the statutes upon which they were based, it would have found that they are not grave and serious.

¶ 41    We conclude, for the following reasons, that (1) the court was not required to do what defendant says it should have done, and (2) the record supports the court's determination that defendant's habitual criminal sentence was not grossly disproportionate. *See id.* at ¶ 35.

¶ 42    Rather than deciding that each predicate offense was grave and serious, the court was only required to consider "whether each triggering offense and the predicate offenses, *in combination,* are so lacking in gravity or seriousness as to give rise to an inference that the sentence imposed on that particular triggering offense is grossly disproportionate." *Id.* at ¶ 38 (emphasis added); *see also People v. Strock,* 252 P.3d 1148, 1158 (Colo. App. 2010)("[I]t is not necessary for each offense to be grave and serious for a court to conclude that the offenses taken together are grave and serious."). The court complied with this requirement when, as we have quoted above, it considered all the offenses together and concluded that, in combination, they were sufficiently grave and serious.

¶ 43 Even if we were to assume that the theft convictions, the possession of a weapon conviction, and the false information conviction were not grave and serious, the court had determined that three other offenses — the second degree murder conviction and illegal discharge of a weapon conviction in this case, and the aggravated robbery conviction — were grave and serious. This was enough to avoid an inference of gross disproportionality. *See Rutter v. People*, 2015 CO 71, ¶¶ 24-25 (upholding the defendant's habitual sentence even though only the triggering offense was grave and serious); *People v. Cooper*, 205 P.3d 475, 481 (Colo. App. 2008)(upholding the defendant's habitual sentence even though neither the triggering nor the predicate offenses were individually grave and serious), *abrogated on other grounds by Scott v. People*, 2017 CO 16. Accordingly, we reject defendant's assertion that we must remand this case for a new abbreviated proportionality review.

B.    Findings During the Habitual Criminal Proceeding

1.    Additional Background

¶ 44 Under section 18-1.3-803(1) and (4), C.R.S. 2024, trial courts used to hold post-conviction evidentiary hearings to decide whether defendants would be sentenced as habitual criminals. (The

legislature recently amended that statute, and juries will make that decision from now on.  2025 Colo. Legis. Serv. Ch. 25-189 (West).)

¶ 45     At the habitual criminal evidentiary hearing in this case, the court asked whether the defense had any preliminary issues. Defense counsel said, "[W]e object — we think the — this trial needs to go to a jury under the United States and Colorado Constitutions." The prosecution responded that, under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), defendant was not entitled to a jury on the habitual criminal counts.  Defense counsel replied,

> [O]ur response is *Apprendi* says that any sort of evidence that enhances a sentence needs to go to the jury.  This would be one of those pieces of evidence, the prior habituals.
>
> I understand the state of the law.  I'm doing it primarily for appellate purposes.  And so as long as our argument is preserved, I don't have any further record.  But that's where we're — that's where we stand today.

¶ 46     The court rejected defense counsel's argument, reasoning that Colorado law does not require habitual criminal counts to be tried to a jury.  It then proceeded with the evidentiary hearing, during which the prosecution presented evidence of defendant's six previous convictions.

¶ 47 At the end of the hearing, the court found that the prosecution had met its burden of proving beyond a reasonable doubt that defendant had been previously convicted of the six prior felonies, that he was the person who had been convicted in those cases, and that his prior convictions arose out of separate and distinct criminal episodes. The court then adjudicated him to be a habitual criminal, and it imposed the sentence we described above.

### 2. Standard of Review and Preservation

¶ 48 We review constitutional challenges to a trial court's sentencing determinations de novo. *Villanueva v. People*, 199 P.3d 1228, 1231 (Colo. 2008).

¶ 49 As a threshold matter, the prosecution submits that we should not address defendant's challenge to his habitual criminal sentence because he did not raise it on appeal until his reply brief. While appellate courts generally do not consider arguments raised for the first time in a reply brief, *see People v. Owens*, 2024 CO 10, ¶¶ 90-91, we will in this case because *Erlinger*, the United States Supreme Court's opinion on which defendant's challenge relies, was not announced until after defendant filed his opening brief. *See*

*Griffith v. Kentucky*, 479 U.S. 314, 328 (1987)(applying new rule of criminal law to "all cases . . . pending on direct review").

### 3. Analysis

#### a. Erlinger

¶ 50 *Erlinger* dealt with a sentencing provision of the federal Armed Career Criminal Act. It enhanced the sentence of a defendant convicted of being a felon possessing a firearm if the defendant had three or more qualifying prior convictions for offenses committed on separate occasions. 602 U.S. at 835. The United States Supreme Court held that the Fifth and Sixth Amendments required a jury, rather than a judge, to decide, unanimously and beyond a reasonable doubt, whether the prior convictions had indeed occurred on separate occasions.

¶ 51 In reaching this holding, the Court reiterated that the prior criminality exception under *Almendarez-Torres v. United States*, 523 U.S. 224 (1998), "persists as a 'narrow exception' permitting judges to find only 'the fact of a prior conviction.'" *Erlinger*, 602 U.S. at 823 (quoting *Alleyne v. United States*, 570 U.S. 99, 111 n.1 (2013)). The Court reaffirmed its prior holding that a sentencing judge "'cannot go beyond identifying the crime of conviction to explore the

manner in which the defendant committed that offense. . . . He can do no more, consistent with the Sixth Amendment, than determine what crime, with what elements, the defendant was convicted of.'" *Id.* at 840 n.3 (quoting *Mathis v. United States*, 579 U.S. 500, 511-512 (2016)).

¶ 52 Defendant asserts that, under *Erlinger*, a jury, rather than the court, should have decided whether his prior convictions had been separately brought and tried, whether he was the person who had been convicted of those prior convictions, and whether his prior offenses were "eligible" as predicate convictions, for purposes of sentencing him as a habitual criminal. He adds that, because of this alleged error, we must remand the case to the court for sentencing within the statutory range for second degree murder because empaneling a new jury to retry his habitual criminal counts would violate the Constitution's Double Jeopardy Clause.

¶ 53 We will assume, without deciding, that *Erlinger* controls our decision and that the jury, rather than the court, should have made the three findings that defendant claims it should have made. Doing so, we nonetheless conclude that (1) the putative error was not structural; (2) we will apply plain error review; (3) the putative

error was not obvious; and, (4) even if it were preserved, there was sufficient evidence in the record to show that the putative error was harmless beyond a reasonable doubt. As a result of these conclusions, we need not address defendant's contention, based on the Double Jeopardy Clause, that we must remand the case to the court for resentencing within the statutory range for second degree murder.

### b. No Structural Error

¶ 54 Contrary to defendant's assertion, any *Erlinger* error in this case was not structural, and is not, therefore, subject to automatic reversal. *See Washington v. Recuenco*, 548 U.S. 212, 222 (2006)("Failure to submit a sentencing factor to the jury, like failure to submit an element to the jury, is not structural error."); *People v. Crabtree*, 2024 CO 40M, ¶¶ 31-35 (where an element of the substantive crime was proven to a judge, rather than a jury, the error was not structural).

### c. Plain Error Review

#### i. Preservation

¶ 55 Defendant did not preserve the contentions that he now makes.

¶ 56 "Raising the 'sum and substance' of an argument is sufficient to preserve it," *People v. Cooley*, 2020 COA 101, ¶ 24, and "[a]n objection is sufficiently specific when it draws the court's attention to the asserted error," *id.* Although we do not require talismanic language to preserve arguments, "[p]arties must make objections that are specific enough to draw the trial court's attention to the asserted error." *Martinez v. People*, 2015 CO 16, ¶ 14. Parties must give the trial court an opportunity to make findings of fact and to reach conclusions of law. *Id.* "An adequate objection allows the trial court a meaningful chance to prevent or correct the error and creates a record for appellate review." *Id.*

¶ 57 Although defense counsel made a general objection that "this trial needs to go to a jury under the United States and Colorado Constitutions," counsel did not say that the jury should decide specific factual questions such as whether defendant's prior convictions had been separately brought and tried, whether he was the person who had been convicted in those prior cases, and whether the prior crimes were eligible as predicate convictions. As a result, counsel's general objection did not alert the court to what he now asserts are reasons to reverse defendant's sentence so that

22

the court could find facts and reach legal conclusions. Rather, the court was not given a chance to prevent or to correct any error.

¶ 58 We will therefore review defendant's assertions for plain error. *See Hagos v. People*, 2012 CO 63, ¶ 14.

### ii. Obviousness

¶ 59 To warrant reversal under plain error review, the court's error must, among other things, be obvious. *Id.* To be obvious "an error must contravene a clear statutory command, a well-settled legal principle, or established Colorado case law." *Crabtree*, ¶ 42. And we must decide whether the error was obvious at the time it occurred in the trial court, not at the time of the appeal. *Id.* at ¶¶ 6-8.

¶ 60 The putative error in this case was not obvious because, when the court denied defense counsel's request for a jury to resolve the habitual criminal counts, it followed existing Colorado law. *See People v. Huber*, 139 P.3d 628, 633 (Colo. 2006); *Lopez v. People*, 113 P.3d 713, 723 (Colo. 2005); *People v. Session*, 2020 COA 158, ¶ 26. And, because it followed binding Colorado precedent, its putative error was not plain. *See People v. Tun*, 2021 COA 34, ¶ 48.

### iii. Constitutional Harmlessness

¶ 61 What if we assume that defendant's assertions had been preserved? We will review the putative error for constitutional harmless error. *See Hagos*, ¶ 11.

¶ 62 But, doing so, we will not reverse defendant's sentence because we conclude that the *Erlinger* error was harmless beyond a reasonable doubt. The record shows that any rational jury would have found, beyond a reasonable doubt, that at least four of defendant's prior convictions had been separately brought and tried, that he was the person who had been convicted in those cases, and that his prior offenses were eligible as predicate convictions. *See United States v. Butler*, 122 F.4th 584, 589 (5th Cir. 2024)(an *Erlinger* error is harmless if, "[a]fter a careful review of the whole record . . . any rational petit jury, when presented with a proper jury instruction, would have found beyond a reasonable doubt" that the defendant's prior offenses occurred on different occasions).

¶ 63 The record reflects that, before the crimes in this case, defendant pled guilty to six felonies: aggravated robbery in Tennessee on September 18, 2006; two separately filed cases

24

alleging counts of theft on November 5, 2010; providing false information to a pawnbroker on September 28, 2012; theft on October 2, 2012; and possession of a weapon by a previous offender on March 4, 2016.

¶ 64    The record contains evidence showing that at least four of the six felonies were separately brought and tried. *See* § 18-1.3-801(2)(a)(I) ("[E]very person convicted . . . of any felony, who has been three times previously convicted . . . of a felony . . . shall be adjudged an habitual criminal . . . ."). Defendant asserts that his three theft convictions were not separately brought and tried because they arose out of incidents occurring within a single week and that he pled guilty to two of them on the same day. But, even if defendant's theft convictions had arisen out of a single criminal episode, defendant does not dispute that four of his prior convictions — aggravated robbery, the "package" of the three theft convictions, possession of a weapon by a previous offender, and providing false information to a pawnbroker — arose out of separate and distinct criminal episodes and were separately brought and tried, as required under the habitual sentencing statute, *see* § 18-1.3-801(2)(a)(I)(A).

¶ 65    As proof that there were at least four felonies that were

separately brought and tried, the record contains charging

documents for each conviction.  The charging documents listed the

dates of the offenses, and they showed that the felonies had arisen

out of separate criminal incidents.  "Charges are separately brought

and tried where they are 'in separate informations, with separate

docket numbers, arising out of separate criminal incidents.'"  *People

v. Williams*, 2019 COA 32, ¶ 38 (quoting *Gimmy v. People*, 645 P.2d

262, 267 (Colo. 1982)).  "A predicate conviction can result from

either a conviction following trial or a guilty plea."  *Id.*

¶ 66    The prosecution presented evidence proving that defendant

was the same person as the person convicted in each of the prior

felonies.  For example, the prosecution's proof

- compared defendant's fingerprints taken at the time of

  his arrest in this case with fingerprints taken from his

  arrests in the six felony cases listed above and

  determined that all the prints came from the same

  person;

- contained photographs taken of defendant at the time

  of his arrests in all the cases; and

- listed the same name, birthdate, Social Security Number, and place of birth in all the cases.

¶ 67 On top of the factors we have already discussed, a conviction must be a felony to be eligible to enhance a defendant's sentence under section 18-1.3-801(2)(a)(I). And, if the conviction occurred in another state, such as defendant's Tennessee conviction for aggravated robbery in this case, it must be for a crime that would be a felony in Colorado. *Id.* Documents in the record show that all the Colorado predicate convictions were for felonies and that the Tennessee aggravated robbery conviction would have been a felony in Colorado.

¶ 68 Last, defendant does not assert that any of the felonies are no longer eligible to support a habitual criminal sentence. *See, e.g., Thomas v. People*, 2021 CO 84, ¶ 60 (based on a statutory exception in the habitual criminal statute, level 4 drug felonies are not "predicate offenses for habitual criminal purposes").

¶ 69 The judgment of conviction and the sentence are affirmed.

JUDGE KUHN and JUDGE MOULTRIE concur.